IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER BUTLER, | : | |
| Plaintiff | : | No. 1:23-cv-01295 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| FEDEX SUPPLY CHAIN, INC., | : | |
| Defendant | : | |

**MEMORANDUM**

This case arises out of the termination of Plaintiff Christopher Butler ("Plaintiff")'s

employment as an Operations Supervisor with Defendant FedEx Supply Chain, Inc.

("Defendant") in October 2021, which Plaintiff alleges violated Title VII of the Civil Rights Act

of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., Section 1981 of the Civil Rights Act of 1866

("Section 1981"), 42 U.S.C. § 1981, the Americans with Disabilities Act ("ADA"), as amended,

42 U.S.C. § 12101 et seq., the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et

seq., and the Pennsylvania Human Rights Act ("PHRA"), 43 Pa. Cons. Stat. § 951 et seq.  Before

the Court is Defendant's motion for summary judgment.  (Doc. No. 48.)  For the reasons that

follow, the Court will grant the motion in its entirety.

I.    BACKGROUND[1]

Plaintiff is an African American man who began working as a "Team Lead" for GENCO,

Defendant's predecessor, on June 13, 2015.  (Doc. No. 49 ¶¶ 10, 84.)  Defendant is an equal

opportunity employer that "maintains a strict policy that prohibits discrimination and harassment

---

[1] The following relevant facts are taken from Defendant's Statement of Undisputed Material Facts ("SUMF") (Doc. No. 49) and Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("RSUMF") (Doc. No. 61-3), and are undisputed unless otherwise noted.  Both the SUMF and the RSUMF contain specific citations to the record at each numbered paragraph.

on the basis of protected status protected by federal, state, or local law." (Id. ¶ 1.)  Defendant

maintains "an Anti-Harassment and Anti-Discrimination Policy" and has a complaint process

that includes "several mechanisms by which employees can report workplace harassment,

discrimination, or retaliation." (Id. ¶ 2.)  Defendant also maintains a "Leaves [sic] of Absence

Policy, which states that it is the policy of [Defendant] to provide protected FMLA leave to

eligible employees in accordance with the FMLA and state law[,]" and maintains "a policy

outlining responsibilities during FMLA leave." (Id. ¶¶ 3, 4.)  Another policy maintained by

Defendant is the "Performance and Conduct Management Policy, which describes the minimum

levels of performance expected of all employees." (Id. ¶ 5.)  The Performance and Conduct

Management Policy dictates that a managerial employee should complete a "Documented

Discussion Form" ("DD") when an employee "fails to perform documented positional duties at

an acceptable level of quality, quantity, timeliness, or when a teammate's performance falls short

of expectations." (Id. ¶¶ 6, 7.)  It also provides that a performance improvement plan ("PIP")

may be initiated "if a teammate does not consistently meet the established level of performance

after a reasonable time." (Id. ¶ 8 (internal quotations omitted).)  The parties dispute whether a

PIP has a minimum time period.  Compare (id. ¶ 9 with Doc. No. 61-3 ¶ 9).[2]

On March 12, 2018, Defendant promoted Plaintiff to the position of Operations

Supervisor.  (Doc. No. 49 ¶ 11.)  The duties of an Operations Supervisor included the following:

> supervising direct reports, ensuring production activities within the warehouse on
> an ongoing basis, preparing and distributing reports needed for day-to-day
> operations, ensuring that employee schedules were correctly implemented, fully
> engaging with the process on the warehouse floor to actively lead and supervise
> teammates, and communicating daily through operational start up meetings.

---

[2]  Defendant maintains that the only parameter for the time period of a PIP is that it should not
last longer than six (6) months (Doc. No. 49 ¶ 9), whereas Plaintiff maintains that a PIP must
also be no shorter than thirty (30) days (Doc. No. 61-3 ¶ 9).

(Id. ¶ 12.)

On September 12, 2016, Shipping Supervisor Jennifer Hamrick ("Hamrick") observed Plaintiff being off task and issued a DD against him.  (Id. ¶ 22.)  Hamrick "counseled [him] to remain on task while at work and not to take other teammates off [] task by talking to them or distracting them[,]" and she warned him that "additional occurrences of being off task could lead to his termination."  (Id. ¶¶ 23, 24.)  Hamrick counseled Plaintiff and issued a DD again on May 31, 2017, "for failing to complete his performance coaching opportunity ("PCO") requirements for three consecutive weeks [, which was] a requirement that Plaintiff admitted he failed to meet."  (Id. ¶ 25.)  "PCOs are twenty-minute meetings that managers are required to have with their teammates to review their performance."  (Id. ¶ 26.)  After the May 31, 2017 DD, Plaintiff agreed to meet the required amount of four (4) PCOs per week going forward.  (Id. ¶ 27.)  On August 8, 2017, Plaintiff received a DD "for failing to follow the guidelines for his area organization audit inspection and failing to send emails that the audit had been completed."  (Id. ¶ 28.)  An area organization audit inspection is conducted "to ensure that the working conditions in the facility are safe in those respective zones and areas that one is assigned to."  (Id. ¶ 29.)  On January 3, 2018, Hamrick issued a DD against Plaintiff for again failing to complete his weekly PCO requirement.  (Id. ¶ 30.)  Plaintiff contends that the DDs issued by Hamrick contain inadmissible hearsay and are immaterial due to their dates and Hamrick's lack of involvement in the termination of Plaintiff's employment.  (Doc. No. 61-3 ¶¶ 22–25, 28, 30.)

On March 12, 2018, Plaintiff started reporting to Peggy Hill ("Hill") as a first shift Operations Supervisor.  (Doc. No. 49 ¶ 31.)  The parties dispute whether Hill counseled Plaintiff for exceeding the allotted time for smoke breaks.  Compare (id. ¶ 32 with Doc. No. 61-3 ¶ 32).[3]

---

[3] Defendant maintains that Plaintiff was counseled by Hill for exceeding the allotted number of

Hill counseled, and issued a DD against, Plaintiff on April 4, 2018, for spending "gratuitous periods of time in other departments that he was not responsible for overseeing and engaging in extended conversations with female teammates" on multiple occasions.  (Doc. No. 49 ¶ 33.)  The parties dispute whether Plaintiff refused an instruction to move his workstation.  Compare (id. ¶ 34 with Doc. No. 61-3 ¶ 34).[4]  The April 4, 2018 DD advised Plaintiff that "further violation of [Defendant's] policies could result in disciplinary action, 'up to and including termination of [his] employment.'"  (Doc. No. 49 ¶ 35.)

The parties dispute whether Supervisor Shanna Slike ("Slike") admonished Plaintiff on August 28, 2018.  Compare (id. ¶ 36 with Doc. No. 61-3 ¶ 36).[5]  The parties also dispute whether

---

smoke breaks, one "during lunch and one additional ten-minute break."  (Doc. No. 49 ¶ 32.)  Plaintiff responds as follows:

> Disputed. See Ex. 7, Butler dep., 150:10-18. Plaintiff further disputes this statement as the materials cited do not support it, in violation of Fed. R. Civ. P 56(c)(1)(B)(the form that purports to be a counseling session is not signed by Plaintiff). By way of further response, Plaintiff disputes that such an assertion is material in any way, since it predated Plaintiff's termination by over three years and his termination was not considered at all prior to April 2021. See Ex. 1, Hill dep., 48:12-22; Ex. 3, [Shanna] Slike dep., 38:15-39:23; Ex. 5, [Miranda] Davis [("Davis")] dep., 19:12-20:10 (prior to the April 28 conversation between Mr. Butler and Ms. Slike, no one from FedEx had discussed terminating Mr. Butler's employment, nor is there a single piece of documentary evidence demonstrating that his termination had even been considered).

(Doc. No. 61-3 ¶ 32.)

[4]  Defendant asserts that Plaintiff was instructed to move his workstation "into one of the available desks within the work area mods [sic] to show a presence for and commitment to his team."  (Doc. No. 49 ¶ 34.)  Defendant also asserts that Plaintiff admitted during his deposition that he did not follow the instruction to move his workstation because "he did not agree with it."  (Id.)  Plaintiff maintains that the cited materials "reflect that Plaintiff did not move his desk because he thought he was being targeted, not because he disagreed with the instruction."  (Doc. No. 61-3 ¶ 34.)  Further, Plaintiff asserts that "[he] nonetheless made himself more available to his team."  (Id.)

[5]  Defendant maintains that Slike reprimanded Plaintiff "for failing to let the Operations Manager on duty know that Plaintiff would be unable to make it to his scheduled overtime shift and

4

Manager Bradley Wagner ("Wagner") disciplined Plaintiff on March 11, 2019.  Compare (Doc.

No. 49 ¶ 37 with Doc. No. 61-3 ¶ 37.)[6]  The parties further dispute whether Plaintiff was

reminded of the importance of PCOs.  Compare (Doc. No. 49 ¶ 38 with Doc. No. 61-3 ¶ 38.)[7]

---

inaccurately telling the Operations Manager that he was working on assigning teammates to remove a product." (Doc. No. 49 ¶ 36.)  Plaintiff responds as follows:

> Disputed. Ex. 7, Butler dep., 168:4-11. Plaintiff further disputes this statement as the materials cited do not support it, in violation of Fed. R. Civ. P 56(c)(1)(B)(the form that purports to be a counseling session is not signed by Plaintiff). By way of further response, Plaintiff disputes that such an assertion is material in any way, since it predated Plaintiff's termination by over three years and his termination was not considered at all prior to April 2021. See also Ex. 1, Hill dep., 48:12-22; Ex. 3, Slike dep., 38:15-39:23; Ex. 5, Davis dep., 19:12-20:10 (prior to the April 28 conversation between Mr. Butler and Ms. Slike, no one from FedEx had discussed terminating Mr. Butler's employment, nor is there a single piece of documentary evidence demonstrating that his termination had even been considered).

(Doc. No. 61-3 ¶ 36.)

[6]  Defendant asserts that Wagner disciplined Plaintiff "for failing to successfully enter two PCO[s] into the database for the prior week." (Doc. No. 49 ¶ 37.)  Plaintiff responds as follows:

> Disputed. Ex. 7, Butler dep., 174:15-176:9. Plaintiff further disputes this statement as the materials cited do not support it, in violation of Fed. R. Civ. P 56(c)(1)(B)(the form that purports to be a counseling session is not signed by Plaintiff). By way of further response, Plaintiff disputes that such an assertion is material in any way, since it predated Plaintiff's termination by over two years and his termination was not considered at all prior to April 2021. See Ex. 1, Hill dep., 48:12-22; Ex. 3, Slike dep., 38:15-39:23; Ex. 5, Davis dep., 19:12-20:10 (prior to the April 28 conversation between Mr. Butler and Ms. Slike, no one from FedEx had discussed terminating Mr. Butler's employment, nor is there a single piece of documentary evidence demonstrating that his termination had even been considered).

(Doc. No. 61-3 ¶ 37.)

[7]  Defendant asserts that "Plaintiff was reminded that the weekly reporting of PCO[s] goes to the corporate level and, as such, has very high visibility." (Doc. No. 49 ¶ 38.)  Plaintiff reiterates the same argument as before: i.e., stating that this fact is disputed, pointing to page one hundred and seventy-four (174) line fifteen (15) though page one hundred seventy-six (176) line nine (9) (174:15–176:9) of his own deposition transcript; and arguing that the March 11, 2019 DD is immaterial, citing Hill's deposition transcript page forty-eight (48) lines twelve (12) through twenty-two (22) (48:12–22), Slike's deposition transcript from page thirty-eight (38) lines fifteen

The parties next dispute whether Plaintiff was warned that failure to enter his PCOs may result in his termination.  Compare (Doc. No. 49 ¶ 39 with Doc. No. 61-3 ¶ 39.)[8]

On April 25, 2019, a female employee anonymously submitted a complaint of harassment against Plaintiff.  (Doc. No. 49 ¶ 40.)[9]  The employee who submitted the April 25, 2019 complaint reported the following: (1) Plaintiff was her supervisor; (2) he "always made [her] feel uncomfortable"; (3) he "always look[ed] at [her] in an inappropriate manner and ma[de] remarks about [her] clothes"; (4) he "ask[ed] [her] for [her] personal phone number" to invite her to attend a club that he owns; and (5) he "kep[t] asking for [them] to hang out" despite her assertions that she had a boyfriend.  (Id. ¶ 41.)[10]

On April 26, 2019, a former female employee submitted an anonymous complaint against Plaintiff for sexual harassment.  (Id. ¶ 42.)[11]  The former employee who submitted the April 26,

---

[15] through to page thirty-nine (39) line twenty-three (23) (38:15–39:23), and Davis' deposition transcript from page nineteen (19) line twelve (12) through to page twenty (20) to line ten (10) (19:12–20:10) with the same parenthetical explaining that no one from Defendant's company had discussed terminating Plaintiff before the April 28 discussion between Plaintiff and Slike. (Doc. No. 61-3 ¶ 38.)

[8]  Defendant maintains that "Plaintiff was told that the failure to perform this action going forward could result in his termination." (Doc. No. 49 ¶ 39.)  Plaintiff, on the other hand, asserts the same arguments as he does in paragraphs thirty-seven (37) and thirty-eight (38). (Doc. No. 61-3 ¶ 39); compare (id. ¶¶ 37, 38 with id. ¶ 39).

[9]  Plaintiff does not dispute that the complaint was submitted; however, he argues that the complaint is immaterial. (Doc. No. 61-3 ¶ 40.)

[10]  Plaintiff contends that the statements are inadmissible hearsay and immaterial due to Defendant's failure to identify the employee's complaint as a reason for Plaintiff's PIP or termination. (Doc. No. 61-3 ¶ 41.)

[11]  Similar to the April 25, 2019 complaint, Plaintiff does not dispute that the April 26, 2019 complaint was submitted but argues that the complaint is immaterial due to Defendant's failure to identify the employee's complaint as a reason for Plaintiff's PIP or termination. (Doc. No. 61-3 ¶ 42.)

2019 complaint reported the following: (1) Plaintiff, her supervisor, "continuously ma[de] [her] feel uncomfortable"; (2) he "[was] always look[ing] at [her] butt and making comments on [her] looks"; and (3) she "felt pressured because [she] didn't want to be fired but instead just quit." (Id. ¶ 43.)[12]

On May 1, 2019, a third anonymous complaint accusing Plaintiff of sexual harassment was submitted. (Id. ¶ 44.)[13] The employee who submitted the May 1, 2019 complaint reported the following: (1) "[Plaintiff,] the first shift manager[,] made constant approach[es] to [her] and others in terms of sex or hanging out at his club"; (2) Plaintiff told her that he has had sex with several women and she "should ask about him"; (3) he asked her whether her boyfriend appreciated her; (4) "he kept telling [her] about this [] club he promote[d] at and how [she] should come and be a VIP guest"; (5) she noticed that he had a "wandering eye when [she] walk[ed] past"; and (6) Plaintiff told her that he had sex with another woman and "that's [] why she got cancer." (Id. ¶ 45.)[14]

Wagner investigated the three complaints and reported that he "provided Plaintiff with non-documented coaching about being too 'friendly' with female teammates[] and had directed him not to hug or kiss the teammates." (Id. ¶ 46.) A female warehouse worker reported that Plaintiff "had favorite female employees," "asked female teammates to come to his club," "and

---

[12] Plaintiff disputes those statements as inadmissible hearsay and as immaterial due to Defendant's failure to identify the employee's complaint as a reason for Plaintiff's PIP or termination. (Doc. No. 61-3 ¶ 43.)

[13] Plaintiff does not dispute that a complaint was submitted but disputes the materiality of the complaint because "employee complaints of harassment have not even been identified by [Defendant] as a reason for his PIP or termination." (Doc. No. 61-3 ¶ 44.)

[14] Plaintiff again disputes these statements on the grounds that they are inadmissible hearsay and immaterial due to Defendant's failure to identify the employee's complaint as a reason for Plaintiff's PIP or termination. (Doc. No. 61-3 ¶ 45.)

spent too much time looking at female employees' bodies." (Id. ¶ 47.)  Plaintiff disputes both statements arguing that they are immaterial, and that the latter statement is based on inadmissible hearsay.  (Doc. No. 61-3 ¶¶ 46, 47.)  A team lead reported similarly that Plaintiff favored female employees, and that one female employee quit due to Plaintiff's comments about how tight her clothes were.  (Doc. No. 49 ¶ 48.)  Another team lead stated similarly that Plaintiff "'checked out' female employees, favored them, and had invited them to his club."  (Id. ¶ 49.)[15]  The parties dispute whether Plaintiff admitted to inviting teammates to his club during his interview with the internal investigator.  Compare (id. ¶ 50 with Doc. No. 61-3 ¶ 50).[16]

Defendant was not able to substantiate the anonymous complaints from the female employees, but it "found that various employees were aware of Plaintiff favoring female employees and inviting them to the club he promoted."  (Doc. No. 49 ¶ 51.)[17]  The parties dispute the outcome of the complaints.  Compare (id. ¶ 52 with Doc. No. 61-3 ¶ 52).[18]  The parties also dispute whether Plaintiff failed to complete his sexual harassment training as of January 15, 2020.  Compare (Doc. No. 49 ¶ 53 with Doc. No. 61-3 ¶ 53).[19]  Further, the parties

---

[15]  Plaintiff contends that those statements are inadmissible hearsay and immaterial due to Defendant failing to identify the complaint of harassment as a reason for Plaintiff's PIP or the termination of his employment.  (Doc. No. 61-3 ¶¶ 48, 49.)

[16]  Defendant asserts that Plaintiff admitted to inviting teammates to his club when interviewed. (Doc. No. 49 ¶ 50.)  Plaintiff, however, denies inviting teammates to a nightclub that he promoted.  (Doc. Nos. 61-3 ¶ 50; 61-4 at 210.)

[17]  Plaintiff states that this assertion is immaterial because it predates the termination of Plaintiff's employment by "over two years," and the harassment complaints were not identified as a factor for his PIP or termination.  (Doc. No. 61-3 ¶ 51.)

[18]  Defendant asserts that Plaintiff received counseling and was required to attend training about and review Defendant's sexual harassment policies (Doc. No. 49 ¶ 52), whereas Plaintiff asserts that he was only required to review the relevant policies and was not required to formally complete training or classes (Doc. No. 61-3 ¶ 52).

[19]  Defendant maintains that "as of January 15, 2020, [] Plaintiff had failed to complete the

dispute the reason why Plaintiff did not complete the training.  Compare (Doc. No. 49 ¶ 54 with Doc. No. 61-3 ¶ 54).[20]  Hill warned Plaintiff that "failure to complete the required training could lead to his termination."  (Doc. No. 49 ¶ 55.)[21]

On February 18, 2020, Plaintiff received a DD for excessive attendance issues, "including leaving early without using personal time."  (Id. ¶ 56.)  In response, Plaintiff clarifies that the reason for the "underlying absences w[as] due to pain and complications related to his hemorrhoids."  (Doc. No. 61-3 ¶ 56.)  On March 3, 2020, Defendant approved Plaintiff's request for an intermittent leave of absence under the FMLA related to his hemorrhoids.  (Doc. No. 49 ¶ 13.)  Plaintiff was allowed to take time off twice per week for his condition provided that he inform his manager and call the Hartford, "a third-party vendor that administers [Defendant's] family and medical leave programs."  (Id. ¶¶ 13–16.)  The parties dispute whether Plaintiff left work early without telling his manager on more than one occasion.  Compare (id. ¶ 17 with Doc. No. 61-3 ¶ 17).[22]

Plaintiff was counseled again on May 25, 2020, "for arriving late to his shift."  (Doc. No.

aforementioned training, in violation of the Acceptable Conduct Policy."  (Doc. No. 49 ¶ 53.) Plaintiff maintains that he was only required to review the relevant policies and was not required to formally complete training or classes.  (Doc. No. 61-3 ¶ 53.)

[20] Defendant asserts that Plaintiff claimed that "he 'didn't do anything wrong, so there was no need for [him] to actually have to take [the sexual harassment training].'"  (Doc. No. 49 ¶ 54.) Plaintiff again asserts that he "was only required to review the relevant policies" and that "[h]e was not required to formally complete training or classes."  (Doc. No. 61-3 ¶ 54.)

[21] Although Plaintiff "does not dispute what the written [DD] purports to allege," he argues that the initial instruction was to "simply review relevant policies."  (Doc. No. 61-3 ¶ 55.)

[22] Defendant asserts that Plaintiff left work early without telling his manager.  (Doc. No. 49 ¶ 17.)  However, Plaintiff asserts that Defendant relies on the unsupported testimony of Hill, whose credibility is at issue.  (Doc. No. 61-3 ¶ 17.)  Plaintiff also asserts that the record indicates that Plaintiff repeatedly informed Hill of his intentions to utilize his approved leave.  (Id.)

49 ¶ 57.)  The parties dispute the accuracy of the second allegation in Plaintiff's May 25, 2020 DD regarding Plaintiff speaking negatively about the leadership contingency plan in violation of the Code of Conduct.  Compare (id. with Doc. No. 61-3 ¶ 57).[23]  Plaintiff was warned that failure to meet the expectations of Operations Supervisors as outlined in the Code of Conduct, including not making negative comments and arriving on time, "could result in further corrective action, including termination."  (Doc. No. 49 ¶ 58.)[24]  On September 22, 2020, Plaintiff faced discipline for violating "Conduct Policy #9 and the Code of Conduct" when he stated "this is f[******] ret[*]rded" upon learning that a fellow Operations Supervisor, who was scheduled to work with him to provide Spanish language translation for interviews, had called out of work.  (Id. ¶ 59.)[25] Plaintiff admitted during his deposition that he made that statement but stated that he did not think his language was inappropriate.  (Id. ¶ 60.)[26]

On December 7, 2020, Plaintiff and Operations Supervisor Laronda Leckie ("Leckie") engaged in a verbal altercation that resulted in Plaintiff's paid suspension.  (Id. ¶ 61.)  The parties dispute whether Plaintiff yelled and stormed off after an operations manager "asked [him and

---

[23]  Defendant maintains that Plaintiff was also counseled for "making negative comments about the leadership contingency plan that was in effect, in violation of the Code of Conduct[,]" "specifically[] the expectations of Operation Supervisors."  (Doc. No. 49 ¶ 57.)  Plaintiff, however, maintains that he did not speak negatively about the contingency plan.  (Doc. No. 61-3 ¶ 57.)

[24]  Although Plaintiff "does not dispute that a counseling took place," he reiterates that he did not speak negatively about the contingency plan.  (Doc. No. 61-3 ¶ 58.)

[25]  Plaintiff does not dispute this fact but explains that "he only whispered the comment as he was walking away from his co-workers towards a bathroom."  (Doc. No. 61-3 ¶ 59.)

[26]  Plaintiff does not dispute this fact but clarifies that he "made a conscious effort to contain his frustration and whispered the comment as he walked away from his co-workers towards a bathroom."  (Doc. No. 61-3 ¶ 60.)

Leckie] to stop arguing on the floor". Compare (id. ¶ 62 with Doc. No. 61-3 ¶ 62).[27] The parties further dispute whether Plaintiff received a final warning as a result of the verbal altercation. Compare (Doc. No. 49 ¶ 63 with Doc. No. 61-3 ¶ 63).[28] The parties agree, however, that Plaintiff was disciplined again on May 6, 2021, "for [] failing to complete his area organization audit for the prior week—his third miss in a [six]-week time period." (Doc. Nos. 49 ¶ 64; 61-3 ¶ 64.) He was reminded to complete the audits each week "in order to remain compliant" and warned that "failure to meet this expectation could lead to further corrective action, including termination." (Doc. No. 49 ¶¶ 65, 66.) The parties dispute whether Plaintiff admitted during his deposition that he failed to conduct the audit. Compare (id. ¶ 67 with Doc. No. 61-3 ¶ 67).[29]

In early June 2021, Hill and Slike, "in conjunction with H[uman] R[esources] [("HR")]," discussed placing Plaintiff on a PIP as the result of Plaintiff's numerous DDs, which "reflected a 'continual lack of commitment towards company responsibilities and expectations.'" (Doc. No. 49 ¶ 68.) Plaintiff disputes that he risked placement on a PIP for his numerous DDs and asserts that Hill and Slike discussed placing him on a PIP to reduce the risk of wrongful termination after being informed of "his worsening medical condition, his continued need for medical leave,

---

[27] Defendant asserts that, during the verbal altercation, an operations manager "asked the two to stop arguing on the floor," but Plaintiff "continued to yell as []Leckie walked away." (Doc. No. 49 ¶ 62.) Plaintiff asserts that he did not yell and storm away. (Doc. No. 61-3 ¶ 62.)

[28] Defendant states that, on December 28, 2020, Plaintiff was issued a final warning as a result of the verbal altercation with Leckie. (Doc. No. 49 ¶ 63.) However, Plaintiff states that the DD reflecting the final warning was not signed by him or a manager and disputes that disciplinary action was warranted. (Doc. No. 61-3 ¶ 63.)

[29] Defendant maintains that Plaintiff admitted during his deposition that "he failed to conduct the audit and that this was grounds for a documented discussion." (Doc. No. 49 ¶ 67.) Plaintiff maintains, however, that the evidence cited by Defendant does not support its statement because he testified that he does not know whether he actually missed the audits but "admitted that missing such audits would be grounds for discipline." (Doc. No. 61-3 ¶ 67.)

and his forthcoming need for block leave for surgery."  Compare (id. ¶ 68 with Doc. No. 61-3 ¶ 68).

On June 10, 2021, Security Officer Jason Medrano reported Plaintiff for failing to show "his IMEI [sic] number after he passed through the metal detectors" and stated "I don't have time for this."  (Doc. No. 49 ¶ 69.)[30]  Hill spoke with Plaintiff about the incident on June 14, 2021, during a meeting reviewing his other DDs.  (Id. ¶ 70.)[31]  That same day, Plaintiff was counseled "for failing to complete his FedEx Learning Center [("FLC")] [] Assignment, Trade Compliance," which was a mandatory training "dictated at the corporate level."  (Id. ¶¶ 71, 72.) "[Plaintiff] had [] been reminded to complete [the FLC training] at shift meetings and via email for over a month."  (Id. ¶ 71.)  Plaintiff also received the following additional DDs on June 14, 2021: (1) "failing to complete an ADA related task regarding one of the teammates he was responsible for, despite the Leave of Absence Team and [HR] reaching out to him on multiple occasions regarding the task"; and (2) "failing to complete another area organization audit—the second documented miss in a [thirty]-day time period."  (Id. ¶¶ 73, 74.)  Further, Hill reminded Plaintiff that he could face corrective action, including termination, for failure to meet expectations.  (Id. ¶ 75.)

On June 22, 2021, Hill gave Plaintiff a performance review of "did not meet expectations."  (Id. ¶¶ 76, 78.)  The review stated that "Plaintiff does not seek, accept, and reflect upon feedback from others without feeling attacked, does not proactively modify his behaviors based on feedback, and rarely displays a sense of urgency, even when falling behind."  (Id. ¶ 77.)

---

[30]  Plaintiff argues this assertion is reliant on inadmissible hearsay.  (Doc. No. 61-3 ¶ 69.)

[31]  Plaintiff disputes this assertion, arguing that the underlying statement is reliant on inadmissible evidence.  (Doc. No. 61-3 ¶ 70.)

Plaintiff admitted in his deposition that Hill told him "you have the potential to do great things" during the performance review meeting.  (Id. ¶ 78.)

On July 6, 2021, Plaintiff did not complete an area organization audit for the week ending on June 27, 2021.  (Id. ¶ 79.)[32]  Earlier that same day, Plaintiff received approval from Defendant for a "leave of absence from July 8, 2021, through August 19, 2021, for surgery on his hemorrhoids."  (Id. ¶ 18.)  At the conclusion of his FMLA leave, Plaintiff immediately took a two-week vacation before returning to work.  (Id. ¶ 19.)  The parties dispute whether Plaintiff acknowledged during his deposition that Defendant provided him with "the opportunity to take the leaves he deemed necessary and did not obstruct or interfere with his ability to take FMLA leave."  Compare (id. ¶ 20 with Doc. No. 61-3 ¶ 20).[33]  The parties also dispute whether Plaintiff admitted during his deposition that Defendant allotted him FMLA leave.  Compare (Doc. No. 49 ¶ 21 with Doc. No. 61-3 ¶ 21).[34]

After Plaintiff returned from leave and vacation, on September 9, 2021, he received the PIP that was discussed by Hill, Slike, and HR prior to his leave.  (Doc. No. 49 ¶ 80.)  The parties

---

[32]  Plaintiff disputes this statement, maintaining that it is unsupported by the materials cited, and states that he refused to sign the DD.  (Doc. No. 61-3 ¶ 79.)

[33]  Defendant states that Plaintiff "does not deny" that it provided him "the opportunity to take the leaves he deemed necessary and did not obstruct or interfere with his ability to take FMLA leave."  (Doc. No. 49 ¶ 20.)  Plaintiff states that the record citation does not support Defendant's assertion and that Defendant "routinely tried to prevent him from utilizing his approved leave." (Doc. No. 61-3 ¶ 20.)

[34]  Defendant maintains that Plaintiff admitted, "if I had any type of flare-ups or anything like that, I had excused time that was – they allotted me to be able to leave . . . I was allotted that time to leave through FMLA to where I wouldn't be disciplined."  (Doc. No. 49 ¶ 21 (internal quotation omitted).)  Plaintiff, however, reasserts his prior argument that the record citation does not support Defendant's assertion and that Defendant "routinely tried to prevent him from utilizing his approved leave."  (Doc. No. 61-3 ¶ 21.)

dispute the purpose of the PIP. Compare (id. ¶ 81 with Doc. No. 61-3 ¶ 81).[35] The parties agree that, under the PIP, Plaintiff was required to "complete all of his assignments within the given deadlines, respond on the same day to requests to acknowledge his receipt of same, and arrive on time for his shifts." (Doc. No. 49 ¶ 82.) The PIP also required Plaintiff to "complete discrete tasks which were a mandatory part of his job—but which Plaintiff had continually failed to meet or ignored—for a period of thirty [(30)] days, including[:]" (1) "one area organization audit per week;" (2) "two [PCOs] per week;" (3) "FLC learning assignments completed within the allotted timeframe;" and (4) "reporting back on discussions of performance and/or attendance deficiencies with teammates he was responsible for overseeing." (Id. ¶ 83.) Plaintiff argues that he was not given thirty (30) days to achieve the goals of the PIP and that he did not "continually fail to perform [his] tasks" as the PIP alleges. (Doc. No. 61-3 ¶ 83.)

On September 14, 2021, Plaintiff "suddenly made a complaint that" Hill, Slike, and Wagner had discriminated against him for being an African American male since 2020. (Doc. No. 49 ¶ 84.) Plaintiff disputes this assertion in part, stating that his complaint was not "sudden" because he complained about discrimination to General Manager Brant Curtis ("Curtis") on September 7, 2021. (Doc. No. 61-3 ¶ 84.) The parties agree that Plaintiff complained about receiving an unfair write up from Slike and receiving a call from Wagner threatening him "while he was off schedule" and "stating that he would lose his job." (Doc. Nos. 49 ¶ 85; 61-3 ¶ 85.) Plaintiff also complained that Wagner unfairly suspended him and that Hill "had included false

---

[35] Defendant states that the purpose of the PIP was "to provide Plaintiff with a final chance to improve his performance and meet the essential duties of his job." (Doc. No. 49 ¶ 81.) However, Plaintiff states that the purpose of the PIP was to reduce the risk of a wrongful termination lawsuit and that the PIP was not designed to help him as evinced by its duration of less than thirty (30) days. (Doc. No. 61-3 ¶ 81.)

information in his performance review to prevent Plaintiff from receiving a bonus." (Doc. Nos. 49 ¶ 86; 61-3 ¶ 86.)

The parties dispute whether Defendant's HR department investigated Plaintiff's allegations and the outcome of the investigation. Compare (id. ¶ 87 with Doc. No. 61-3 ¶ 87.)[36] The parties also dispute whether Plaintiff admitted in his interview during the investigation that the performance deficiencies were valid. Compare (Doc. No. 49 ¶ 88 with Doc. No. 61-3 ¶ 88.)[37] Defendant states that, during the internal investigation, Leckie was interviewed, did not substantiate Plaintiff's allegations of race or sex discrimination, and reported Plaintiff's "excessive amounts of time off task," his conversations with female employees, and his use of his phone to organize "pop-up events as part of his side business." (Doc. No. 49 ¶ 89.) Plaintiff states, however, that there were no competent findings of fact made during Gary Young ("Young")'s investigation because he "failed to meet his own basic standards for a workplace investigation." (Doc. No. 61-3 ¶ 89.) As to the investigation's determination regarding Wagner's phone call, Defendant asserts that the investigation determined that Wagner "made no threats against Plaintiff and instead called him out of a sincere desire for Plaintiff to improve and avoid being terminated." (Doc. No. 49 ¶ 90.) Plaintiff, however, asserts again that there were no

---

[36] Defendant maintains that it investigated Plaintiff's allegations and deemed them unsubstantiated (Doc. No. 49 ¶ 87), whereas Plaintiff maintains that the investigation conducted by Gary Young ("Young") "failed to meet his own basic standards for a workplace investigation" (Doc. No. 61-3 ¶ 87).

[37] Defendant asserts that Plaintiff admitted that some of the performance deficiencies in the DDs were valid but that "he did not agree that completing those tasks was important, including the sexual harassment training, reviewing the contingency plan, and reporting to the contingency plan meeting." (Doc. No. 49 ¶ 88.) Plaintiff asserts that "the cited materials reflect Plaintiff's belief that he was being held to discriminatory standards relative to his peers." (Doc. No. 61-3 ¶ 88.)

15

competent findings of fact made during Young's investigation because Young failed to meet his

own basic standards for a workplace investigation.  (Doc. No. 61-3 ¶ 90.)  In addition, the parties

dispute whether Plaintiff received a bonus.  Compare (Doc. No. 49 ¶ 91 with Doc. No. 61-3 ¶

91.)[38]  The parties dispute whether Hill or Slike knew of Plaintiff's complaint against them for

discrimination.  Compare (Doc. No. 49 ¶ 92 with Doc. No. 61-3 ¶ 92.)[39]

The parties dispute whether Hill met with Plaintiff once per week while he was on the

PIP, as it provided.  Compare (Doc. No. 49 ¶ 93 with Doc. No. 61-3 ¶ 93.)[40]  The parties dispute

whether Plaintiff made progress under the PIP.  Compare (Doc. No. 49 ¶¶ 94–97 with Doc. No.

61-3 ¶¶ 94–97.)[41]  Plaintiff's employment was terminated on October 19, 2021, due to his poor

---

[38]  Defendant maintains that Plaintiff received a bonus (Doc. No. 49 ¶ 91), whereas Plaintiff
maintains that "[i]t was determined that negative performance reviews impact bonus eligibility"
(Doc. No. 61-3 ¶ 91).

[39]  Defendant states that "[n]either Hill nor Ms. Slike were aware that Plaintiff submitted a
complaint alleging discrimination."  (Doc. No. 49 ¶ 92.)  Plaintiff states that Slike and Hill knew
of his complaint based on: (1) "the hostile manner in which the PIP was administered"; and (2)
the fact that Curtis and Young had knowledge of the complaint.  (Doc. No. 61-3 ¶ 92.)  Plaintiff
also notes that "it is undisputed that [] Curtis and [] Young, two individuals who were involved
in the decision [to] terminate [Plaintiff], had knowledge of his discrimination complaints."  (Id.)

[40]  Defendant asserts that Hill met with Plaintiff once a week to review his progress on the PIP
(Doc. No. 49 ¶ 93), whereas Plaintiff asserts that "he testified [during his deposition] that she did
not" (Doc. No. 61-3 ¶ 93).

[41]  Defendant maintains that Plaintiff: (1) "continued to arrive late for the start of his shifts and
miss mandatory start of shift meetings"; (2) "failed to complete his PCO[s] on time"; (3) "failed
to draft several documented discussions regarding attendance violations of his teammates"; (4)
"failed to communicate with the representatives of staffing agencies to address low performing
temporary employees[, whom] he was responsible for overseeing"; (5) "did not respond to
requests for an acknowledgment that he would not leave the operations floor before all
teammates were gone"; (6) "did not respond to the manager's request for a face-to-face PIP
meeting"; (7) "failed and/or refused to […] show[] up for the start of shift meetings [or] follow[]
through with requests for information, emails, or direct face-to-face directions"; and (8) "failed
and/or refused to complet[e] administrative tasks on time[,] […] address[] teammates who were
having attendance issues[,] and […] track the performance of teammates he was responsible for."
(Doc. No. 49 ¶¶ 94–97.)  Plaintiff maintains, however, that Hill "was unable to provide specific

performance and failure to complete the PIP.  (Doc. No. 49 ¶ 98.)  Plaintiff disputes that the

termination of his employment was due to his failure to complete the PIP.  (Doc. No. 61-3 ¶ 98.)

In total, Plaintiff "was formally disciplined no fewer than 21 times based on his poor

performance and violations of [Defendant's] policies."  (Doc. No. 49 ¶ 99.)  Although the parties

agree that Plaintiff admitted during his deposition that he received counseling from his

supervisors on numerous occasions (id. ¶ 100; Doc. No. 61-3 ¶ 100), the parties dispute whether

Plaintiff took his workplace discipline seriously, compare (Doc. No. 49 ¶ 101 with Doc. No. 61-

3 ¶ 101).[42]

Plaintiff commenced this action on April 13, 2023.  (Doc. No. 1.)  Plaintiff's complaint

asserts disparate treatment discrimination and retaliation claims under Title VII, Section 1981,

the ADA, and the PHRA.  Plaintiff also asserts a claim of retaliation under the FMLA.  (Id.)

Defendant filed its answer on June 16, 2023.  (Doc. No. 6.)

The Court held a case management conference on October 17, 2023, after which the

Court issued a case management Order setting a close of fact discovery date of January 26, 2024.

(Doc. No. 22.)  After the parties filed two motions for an extension of time to complete discovery

and a letter requesting a rescheduling of the post-discovery status conference, the Court held a

post-discovery status conference on June 13, 2024.  (Doc. Nos. 24, 28, 30.)  On August 15, 2024,

the Court issued an Order directing the parties to file dispositive motions on or before September

---

examples to support her accusation of poor performance under the PIP" during her deposition
and that he demonstrated satisfactory performance "in certain core areas of the PIP, such as
conducting area audits, maintaining timecards, and properly updating the team's 'HR Planner.'"
(Doc. No. 61-3 ¶¶ 94–97.)

[42]  Defendant asserts that Plaintiff did not take his prior instances of discipline seriously (Doc.
No. 49 ¶ 101), whereas Plaintiff asserts that the materials Defendant cites are Plaintiff's
explanation of his belief that the instances of discipline were part of discriminatory and
retaliatory conduct (Doc. No. 61-3 ¶ 101).

16, 2024.  (Doc. No. 40.)

After two motions to extend the deadline to file dispositive motions  (Doc. Nos. 41, 43), Defendant filed its motion for summary judgment along with its brief in support, SUMF, and exhibits on November 15, 2024 (Doc. Nos. 48–50).  Defendant also filed an unopposed motion for leave to file exhibits under seal.  (Doc. No. 51.)  On November 25, 2024, the Court struck Defendant's exhibits for failure to submit those proposed exhibits under seal.  (Doc. No. 53.)  In the November 25, 2024 Order, the Court directed Defendant to refile the proposed exhibits for sealing under seal and to show cause as to why those exhibits should not be made a part of the publicly available docket in this matter under the standards applicable to judicial records articulated by the United States Court of Appeals for the Third Circuit ("Third Circuit") in In re Avandia Marketing, Sales Practices and Products Liability Litigation, 924 F.3d 662 (3d Cir. 2019).  (Id.)  The November 25, 2024 Order further directed the Clerk of Court to maintain the documents to be refiled by Defendant provisionally under seal until further Order of the Court. (Id.)  Defendant refiled its exhibits on November 26, 2024.  (Doc. No. 54.) Defendant also separately refiled its proposed exhibits for sealing, Exhibits U, V, W, X, and PP, under seal on the same day.  (Doc. No. 57-1 through 57-5.)  On December 6, 2024, Defendant filed a brief in support of its motion to seal.  (Doc. No. 58.)  On August 6, 2025, the Court issued a Memorandum and corresponding Order granting Defendant's motion to seal insofar as it permitted Defendant to file redacted versions of its Exhibits U, V, W, X, and PP.  (Doc. Nos. 69, 70.)

After requesting an extension of time (Doc. No. 55), Plaintiff filed a brief in opposition to Defendant's motion for summary judgment on January 30, 2025 (Doc. No. 61), as well the

RSUMF (Doc. No. 61-3).  Defendant filed its reply brief on March 4, 2025 (Doc. No. 68),[43]

after it moved twice for an extension of time to file that brief (Doc. Nos. 62, 64).  Having been

fully briefed, Defendant's motion for summary judgment is ripe for resolution.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is

warranted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute

is material if it might affect the outcome of the suit under the applicable law, and it is genuine

only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a

verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49

(1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must

prevail as a matter of law.  See id. at 251–52.  In making this determination, the Court must

"consider all evidence in the light most favorable to the party opposing the motion."  See A.W.

v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an

---

[43]  The Court observes that Defendant's reply brief contains a "Response to Plaintiff's 'Statement of Relevant Facts'" (Doc. No. 68 at 43–68), which appears to be a rebuttal to the counterstatement of facts contained in Plaintiff's brief in opposition (Doc. No. 61 at 8–18). Defendant's "Response to Plaintiff's 'Statement of Relevant Facts'" is an inappropriate addition to Defendant's reply brief because the Local Rules do not permit, and the Court did not provide leave to file, such a document.  Accordingly, the Court disregards that portion of Defendant's reply brief (Doc. No. 68 at 43–68), pursuant to its inherent powers to disregard materials improperly before it.  See Lombard v. MCI Telecom. Corp., 13 F. Supp. 2d 621, 625 (N.D. Ohio 1998) (reiterating the court's ability to disregard materials improperly before it); see also Dillon v. Village of Piketon, Ohio, et al., No. 2:10-cv-00888, 2011 WL 2632802, at *2 (S.D. Ohio July 5, 2011) (disregarding all matters not properly before the court).  However, the Court considers the entirety of the record before it in addressing the instant motion.

absence of a genuine dispute of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial.  See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.    DISCUSSION

As noted supra, Plaintiff's complaint asserts claims of disparate treatment discrimination and retaliation in violation of Title VII, Section 1981, the ADA, and the PHRA, and retaliation in violation of the FMLA (Counts I–V).  Defendant has moved for summary judgment on all five counts of Plaintiff's complaint.  The Court will first address Plaintiff's disparate treatment discrimination claims under Title VII, Section 1981, and the ADA before addressing Plaintiff's retaliation claims under Title VII, Section 1981, the ADA, and the FMLA.

### A.      Disparate Treatment Discrimination—Title VII, § 1981, and the PHRA

#### 1.      Legal Standard[44]

Under Title VII and Section 1981, a discrimination case "is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII [and Section 1981]." See Qin v. Vertex, Inc., 100 F.4th 458, 472 (3d Cir. 2024) (quoting E.E.O.C. v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990)).  Where circumstantial evidence is used to prove discriminatory intent, courts analyze that evidence using the McDonnell Douglas[45] burden-shifting framework, which requires the plaintiff to first establish a prima facie case of disparate treatment.  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).  A prima facie case is established when, by a preponderance of the evidence, the plaintiff shows: (1) he or she is a member of a protected class; (2) he or she is qualified for the position; (3) he or she suffered an adverse employment action; and (4) either the adverse employment action occurred under circumstances giving rise to an inference of intentional discrimination or similarly-situated non-members of a protected class were treated more favorably.  See id. at 410–11.  An adverse employment action in the disparate treatment discrimination context is defined as an action that causes "some harm respecting an identifiable term or condition of employment."  See Muldrow v. City of St. Louis, Missouri, 601 U.S. 346, 354–55 (2024) (defining an adverse employment action in discrimination cases); accord Peifer v. Bd. of Prob. & Parole, 106 F.4th 270, 277 (3d

---

[44]  The Court reviews these discrimination claims under the applicable federal framework because the Third Circuit has determined that the PHRA is the state analog of Title VII and Section 1981 discrimination claims.  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999) (establishing that the standards for determining disparate treatment discrimination and retaliation claims brought under Title VII, Section 1981, and the PHRA are the same).

[45]  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Cir. 2024).  To raise an inference of discrimination, a plaintiff must show acts that "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  See Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978); see also Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 356 (3d Cir. 1999) (explaining that "Supreme Court precedent . . . clearly require[s] only 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion'" (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996))).

Once a prima facie case has been shown, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  See McDonnell Douglas, 411 U.S. at 802.  If the defendant provides a legitimate, nondiscriminatory reason for the adverse action, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the legitimate reason provided by the defendant was a pretext for discrimination. See id. at 804; Jones, 198 F.3d at 412.

The Third Circuit has instructed that a plaintiff may defeat a summary judgment motion by "pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's legitimate articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  See Jones, 198 F.3d at 413 (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996)).  The Third Circuit instructs that, as to the disbelief factor of Fuentes, "the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."  See Jones, 198 F.3d at 413

22

(quoting <u>Keller v. Orix Credit All., Inc.</u>, 130 F.3d 1101, 1108–09 (3d Cir. 1997)).  In the alternative, to establish pretext based on the argument that a discriminatory reason was "more likely than not a motivating or determinative cause," a plaintiff must present evidence "with sufficient probative force" to allow a factfinder to "conclude by a preponderance of the evidence that [race or sex] was a motivating or determinative factor."  <u>See</u> <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 644–45 (3d Cir. 1998) (citing <u>Keller</u>, 130 F.3d at 1111); <u>see also</u> <u>Jones</u>, 198 F.3d at 413 (applying <u>Simpson</u> to a Title VII and Section 1981 race discrimination claim).  To do so, a plaintiff may point to evidence demonstrating that: "the employer has previously discriminated against [the plaintiff];" "the employer has discriminated against other persons within the plaintiff's protected class;" or  "the employer has treated more favorably similarly situated persons not within the protected class."  <u>See</u> <u>Simpson</u>, 142 F.3d at 645; <u>Jones</u>, 198 F.3d at 413.

## 2.      Arguments of the Parties

Defendant argues that it is entitled to summary judgment as to Plaintiff's Title VII, Section 1981 and related PHRA disparate treatment discrimination claims because he cannot point to evidence to support that he was terminated based on his race or sex.  (Doc. No. 50 at 9.) Defendant first asserts that the only adverse action suffered by Plaintiff was his termination, arguing that Plaintiff's paid suspension, alleged denial of a bonus, and placement on a PIP do not constitute adverse employment actions because: (1) a paid suspension cannot constitute an adverse employment action; (2) Plaintiff in fact received a bonus; and (3) Plaintiff's PIP required him "to perform the baseline requirements of his job," which does not amount to a change in employment status as required for an adverse employment action.  (<u>Id.</u> at 15–16.)

Defendant argues that Plaintiff cannot establish facts sufficient to satisfy the fourth

23

element of a prima facie case of discrimination related to his termination, maintaining that Plaintiff has not identified a comparator who was treated more favorably than he was because of his race or sex and has not provided any other evidence that gives rise to an inference of discrimination.  (Id. at 16–17.)  Defendant also argues that, even assuming Plaintiff could satisfy a prima facie case of discrimination, Plaintiff fails to identify evidence that casts doubt on its legitimate, nondiscriminatory reason for the termination of Plaintiff's employment— his "continual poor performance and violation of [Defendant's] policies."  (Id. at 17–18.)  Defendant argues that Plaintiff "cannot point to any testimony or documentary evidence which shows a connection between his race/sex and his termination."  (Id. at 21.)

In response, Plaintiff contends that he has provided evidence of race and sex discrimination.  (Doc. No. 61 at 38.)  Plaintiff notes that Defendant challenges only the fourth prong of his prima facie case, i.e., whether the undisputed evidence of record establishes that "the adverse employment action occurred under circumstances giving rise to an inference of discrimination or that similarly situated non-members of a protected class were treated more favorably."  (Id. at 37); see Jones, 198 F.3d at 411.  Plaintiff argues that he has provided evidence of Defendant inadequately investigating Plaintiff's complaint of race and sex discrimination and of two non-black female peers, Leckie and Emily Heines ("Heines"), who were treated more favorably by Defendant, to support a reasonable inference of race and sex discrimination.  (Id. at 38–39.)  Plaintiff also argues that he has adduced sufficient evidence that Defendant's articulated reason for his termination was a pretext for race or sex discrimination. (Id. at 39.)

### 3.      Whether Defendant Is Entitled to Summary Judgment as to Plaintiff's Race and Sex Discrimination Claims

The parties agree that the undisputed evidence of record demonstrates that Plaintiff is a

member of a protected class—i.e., male and African American—that he is qualified for the

position of Operations Supervisor, and that he suffered the adverse employment action of

termination.[46]  (Doc. Nos. 50 at 15–17; 61 at 37.)  As to the fourth prong of a prima facie case of

race or sex discrimination, Plaintiff asserts that he has produced evidence of his employer failing

to adequately investigate his complaint of discrimination and of two similarly situated

comparators treated more favorable than him to satisfy the fourth prong of a prima facie case.

Upon careful consideration of the evidence of record and the parties' arguments, and

construing all evidence of record in the light most favorable to Plaintiff, the non-moving party,

the Court concludes that Plaintiff fails to point to evidence from which a reasonable factfinder

could conclude that he has established the fourth prong of a prima facie case of race or sex

discrimination.  The undisputed evidence of record does not demonstrate that Defendant

inadequately investigated Plaintiff's complaint of race and sex discrimination or that Plaintiff's

proffered female peers are similarly situated comparators.

As to the adequacy of Defendant's investigation into Plaintiff's complaint of

---

[46]  As noted supra, Defendant argues that only Plaintiff's termination should be considered an adverse employment action for the purposes of Plaintiff's claims of race and sex discrimination. (Doc. No. 50 at 15.)  In his opposition brief, Plaintiff fails to acknowledge Defendant's argument that his paid suspension, alleged loss of a bonus, and placement on a PIP should not be considered adverse employment actions in connection with his race and sex discrimination claims.  (Doc. No. 61 at 37 ("FedEx only challenges the last prong").)  Accordingly, the Court considers this issue forfeited by Plaintiff and addresses only the parties' arguments regarding the fourth prong of the prima facie case in the context of the adverse employment action of his termination.  See Jimenez v. Best Behav. Healthcare, Inc., 391 F. Supp. 3d 380, 387 (E.D. Pa. 2019) (concluding that a defendant waived any counter-argument when it "d[id] not submit any argument rebutting" the plaintiff's argument that the FLSA applies); see also Hamer v. Neighborhood Hous. Servs. of Chicago, 583 U.S. 17, 20 n.1 (2017) ("The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous. Forfeiture is the failure to make the timely assertion of a right; waiver is the 'intentional relinquishment or abandonment of a known right." (cleaned up) (internal quotations and citations omitted)).

discrimination, Plaintiff asserts generally that he raises a genuine dispute of material fact as to the fourth prong of a prima facie case because Young admitted in his deposition that he did not interview Hill, Slike, or Curtis,[47] which failed Young's "minimum standards" for an investigation into a complaint of discrimination.  (Doc. No. 61-3 ¶¶ 87–90.)  Plaintiff also argues that Young failed to investigate his "complaints of gender or disability discrimination at all." (Id.)  The Court concludes, however, that there is no genuine dispute of material fact.  The evidence of the investigation and its findings and conclusions are material because the adequacy of Defendant's investigation into Plaintiff's complaint of race and sex discrimination might serve as evidence of Defendant's motive for terminating Plaintiff's employment.  The evidence, however, is insufficient to allow a factfinder to conclude that the investigation of Plaintiff's complaint of race and sex discrimination was inadequate.  The undisputed facts of record demonstrate that Plaintiff mischaracterizes Young's statements in his deposition as to the requirements of an investigation.  Young never stated that interviewing all the accused/respondents of an investigation is his "minimum standard" for an investigation but rather that interviewing respondents is important.  (Doc. No. 61-4 at 135.)  The undisputed evidence of record also indicates that Young interviewed Wagner, whom Plaintiff accused of discrimination.  (Doc. Nos. 61-4 at 154; 71-5 at 3, 7–8, 11.)  Although Young did not interview Hill or Slike, that fact does not suffice to create a genuine dispute because Defendant's policies state that an investigation "may include [] interviewing the [. . .] respondent to ascertain all of the facts and circumstances relevant to the complaint[.]" (Doc. No. 54 at 7.)  Moreover, Young

---

[47]  Although Plaintiff asserts in his RSUMF that Young failed to interview the perpetrators of discrimination, including Curtis, the Court notes that the undisputed evidence of record demonstrates that Plaintiff did not accuse Curtis of discrimination.  (Doc. No. 71-5 at 3.) Plaintiff accused only Hill, Slike, and Wagner of discrimination.  (Id.)

explained during his deposition that he did not need to interview Hill and Slike because he knew the performance documentation from them was warranted.  (Doc. No. 61-4 at 153.)

As to Plaintiff's contention that Young failed to investigate gender or disability discrimination claims, Young's report indicates that he investigated discrimination against Plaintiff as an African American <u>male</u>.  (Doc. No. 71-5 at 4–6.)  Although Plaintiff complained to Curtis of disability discrimination (Doc. No. 61-4 at 103), he did not mention disability discrimination in either his Alertline complaint or in his interview with Young (<u>Id.</u> at 149; Doc. No. 71-5 at 4–6).  Therefore, the Court determines that the evidence proffered by Plaintiff is insufficient to allow a reasonable factfinder to conclude that the adequacy of Defendant's investigation supports an inference of discrimination so as to satisfy the fourth prong of a prima facie case of race or sex discrimination.  <u>See</u> <u>Palmer v. Fed. Express Corp.</u>, 235 F. Supp. 3d 702, 716 (W.D. Pa. 2016) (concluding that a plaintiff's evidence consisting of a failure to interview a witness and the overall manner of investigation, without any evidence of discrimination, does not raise an inference of discrimination).

Plaintiff also fails to demonstrate that his proffered female peers are similarly situated comparators.  To be considered similarly situated, a comparator employee need not be identical but must be similarly situated in "all material respects."  <u>See</u> <u>Qin</u>, 100 F.4th at 474 (citing <u>In re Trib. Media Co.</u>, 902 F.3d 384, 403 (3d Cir. 2018)).  Factors that are relevant include the following: "whether the employees dealt with the same supervisor"; whether they "were subject to the same standards"; whether they "shared similar job responsibilities"; and whether they "engaged in the same conduct."  <u>See</u> <u>id.</u>; <u>In re Trib. Media Co.</u>, 902 F.3d at 403.  "An employee who holds a different job title or works in a different department is not similarly situated."  <u>Qin</u>, 100 F.4th at 474 (citation omitted).

Plaintiff identifies Leckie and Heines as two employees not of his protected class who were treated more favorably than him. As to Leckie, Plaintiff fails to point to evidence demonstrating that she is similarly situated because she did not have a similar history of poor performance. The undisputed evidence of record shows that Plaintiff had at least eighteen (18) DDs for failure to perform the duties of an Operations Supervisor and poor attendance, while the record is silent as to whether Leckie received an equivalent number of DDs, failed to perform the duties of an Operations Supervisor, or had poor attendance. Therefore, although Leckie held the same position as Plaintiff, reported to the same supervisor as Plaintiff, and even requested FMLA leave like Plaintiff, without evidence of a similar history of poor performance, Leckie cannot be said to have "engaged in the same conduct" as he did, and therefore she is not similarly situated to him in "all material respects." See In re Trib. Media Co., 902 F.3d at 403 (establishing that a comparator is "similarly situated in all respects" when he or she "dealt with the same supervisor, was subject to the same standards, and engaged in the same conduct" (cleaned up) (internal quotation and citation omitted)). Accordingly, Leckie is not a comparator employee.

Plaintiff also fails to point to evidence demonstrating that Heines was similarly situated to him in all material respects. The undisputed evidence of record shows that Heines was an Operations Supervisor at the time of Plaintiff's employment on the "outbound side" who is alleged to have had a relationship with a colleague. (Doc. No. 61-4 at 30, 87–88.) However, the undisputed evidence of record is silent as to whether she had a history of failing to perform the duties of an Operations Supervisor yet was treated more favorably than Plaintiff. (Id. at 30, 87–88.) Accordingly, although Heines shared one of Plaintiff's supervisors (Slike) and his position, the Court concludes that Plaintiff fails to point to evidence demonstrating that Heines engaged in the same conduct as he did, and therefore he fails to demonstrate that she is similarly situated in

28

all material respects.  See In re Trib. Media Co., 902 F.3d at 403 (stating that a plaintiff must

show that a comparator "engaged in the same conduct" to be considered similarly situated in all

respects).  Accordingly, Heines is not a comparator employee.

For the foregoing reasons, the Court concludes that Plaintiff has failed to point to

evidence from which a reasonable factfinder could conclude that he has established a prima facie

case of race or sex discrimination under Title VII, Section 1981, or the PHRA.  Accordingly, the

Court will grant Defendant's motion for summary judgment as to Plaintiff's claims of disparate

treatment discrimination under Title VII, Section 1981, and the PHRA.  The Court turns to

Plaintiff's claims of disability discrimination.

### B.    Disability Discrimination—ADA and PHRA

#### 1.    Legal Standard[48]

Under the ADA, employers are prohibited from discriminating "against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."  See 42 U.S.C. § 12112(a).  Where circumstantial

evidence is used to prove discriminatory intent in the ADA context, courts also utilize the

McDonnell Douglas burden-shifting framework.  See Shaner v. Synthes, 204 F.3d 494, 500 (3d

Cir. 2000).  To establish a prima facie discrimination claim under the ADA, a plaintiff must

---

[48]  The Court reviews Plaintiff's ADA and PHRA claims under the federal framework because
the Third Circuit has reaffirmed that the PHRA is to be interpreted consistently with the ADA.
See Morgan v. Allison Crane & Rigging LLC, 114 F.4th 214, 220 n. 21 (3d Cir. 2024)
(addressing whether the PHRA and ADA should be interpreted consistently after the enactment
of the ADA Amendments Act ("ADAAA") and concluding that "[a]bsent an act of the
Pennsylvania legislature or guidance from Pennsylvania courts that the ADAAA is inconsistent
with the PHRA, federal courts should continue to interpret the PHRA in harmony with the
ADA").

demonstrate that (1) "he is a disabled person within the meaning of the ADA"; (2) "he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer"; and (3) "he has suffered an otherwise adverse employment decision as a result of discrimination."  See Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999).

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual," "a record of such an impairment," or "being regarded as having such an impairment."  See 42 U.S.C. §§ 12102(1)(A)–(C).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  See 42 U.S.C. § 12102(2)(A).  A major life activity also "includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive function."  See id. § 12102(2)(B).  Although the ADA does not define "substantially limits," the Equal Employment Opportunity Commission ("EEOC")'s regulations provide that:

> [a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.  Nonetheless, not every impairment will constitute a disability within the meaning of this section.

See 29 C.F.R. § 1630.2(j)(1)(ii); accord Morgan v. Allison Crane & Rigging LLC, 114 F.4th 214, 223 & n.39 (3d Cir. 2024) (utilizing the EEOC's construction of "substantially limits" found in its regulations).

30

"The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis." Albertson's, Inc.v. Kirkingburg, 527 U.S. 555, 566 (1999) (citation omitted).  To determine whether a plaintiff is disabled, the Court "must first identify the specific life activities that [the plaintiff] claims are affected and determine whether those activities are major life activities under the ADA, and then must evaluate whether [the plaintiff's] impairment substantially limits those major life activities."  See Parrotta v. PECO Energy Co., 363 F. Supp. 3d 577, 590–91 (E.D. Pa. 2019) (internal quotation marks omitted) (citing Mills v. Temple Univ., 869 F. Supp. 2d 609, 620 (E.D. Pa. 2012) and Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306–07 (3d Cir. 1999)).  The Court "measure[s] disability at the time the adverse action occurred."  See Parrotta, 363 F. Supp. 3d at 591.  Alternatively, to establish a "record of" a disability a plaintiff is required to prove that she had a "history of, or had been misclassified as having, an impairment that substantially limited a major life activity."  See Eshelman v. Agere Sys., Inc., 554 F.3d 426, 437 (3d Cir. 2009) (internal quotations omitted).

Second, the ADA defines a qualified individual as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  See 42 U.S.C. § 12111(8).  To determine whether an individual with a disability is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer, the Court must undertake a two-step inquiry:

> First, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.  Second, the court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.

31

See Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998) (internal quotation marks and citation omitted).  "The determination of whether an individual with a disability is qualified is made at the time of the employment decision."  Id. at 580.  However, "the question is not merely whether [the plaintiff] could perform the essential functions of his job but rather could [he] perform the essential functions with or without a reasonable accommodation."  See Reyer v. Saint Francis Country House, 243 F. Supp. 3d 573, 594 (E.D. Pa. 2017).

An adverse employment action is one that causes "some harm respecting an identifiable term or condition of employment."  See Muldrow, 601 U.S. at 354–55; accord Peifer, 106 F.4th at 277.  The Third Circuit instructs that "[d]iscrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities[] but also includes failing to make reasonable accommodations for a plaintiff's disabilities."  See Taylor, 184 F.3d at 306.

"If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'"  Shaner, 204 F.3d at 500 (citation omitted).  If the defendant points to a legitimate, nondiscriminatory reason for its action, a plaintiff must, to defeat a motion for summary judgment, "point[] to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's legitimate articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  See id. at 501 (internal citations and quotations omitted).

### 2.    Arguments of the Parties

Defendant argues that it is entitled to summary judgment as to Plaintiff's claim of disability discrimination in violation of the ADA and PHRA.  (Doc. No. 50 at 22.)  Defendant first argues that Plaintiff cannot satisfy the first prong of the prima facie case because Plaintiff

cannot point to evidence indicating that he was disabled at the time his employment was terminated, maintaining that Plaintiff was cleared to return to work without restrictions on August 19, 2021, and noting that Plaintiff cannot identify any evidence demonstrating that a major life activity was impaired between that date and his termination on October 19, 2021.  (Id. at 23–24.)  Defendant further argues that Plaintiff cannot establish a causal connection between Plaintiff's medical condition and his termination, stating that its "mere awareness that Plaintiff previously had hemorrhoids does not create an inference of discrimination" to establish the third prong of a prima facie case.  (Id. at 25.)  Defendant maintains that, even if Plaintiff could establish a prima facie case, Plaintiff cannot demonstrate that its termination of Plaintiff's employment was a pretext for disability discrimination, arguing that Plaintiff fails to point to any evidence beyond his own conclusory allegations showing that his hemorrhoid condition played any role in his termination.  (Id. at 26–27.)

In response, Plaintiff contends that the undisputed evidence of record demonstrates that he has established a prima facie case of disability discrimination.  (Doc. No. 61 at 20.)  As to the first prong, Plaintiff asserts that the undisputed evidence of record demonstrates that his hemorrhoids condition is a disability under the ADA, maintaining that the condition is "recurring and episodic" and at times prevents him from sitting or standing, which means that his condition "substantially limit[s] [major life activities] when active," in accordance with regulations implementing the ADAAA.  (Id. at 20–21.)  Plaintiff argues that his hemorrhoids condition "impaired his ability to sit and stand for prolonged periods of time, to ride a motorcycle, to pass bowel movements (in particular without experiencing bleeding), and even to maintain a normal and healthy diet."  (Id. at 21–22.)  Plaintiff also maintains that Defendant knew of his hemorrhoid condition and its effects on him, which fits the "record of" definition of a disability

33

under the ADA.  (Id. at 22.)

Plaintiff next argues that, as to the adverse employment prong, both his 2021 negative performance review and his termination count as adverse employment actions.  (Id. at 24.) Plaintiff maintains that his 2021 negative performance review reduced his 2021 bonus eligibility, and therefore that negative performance evaluation constitutes an adverse employment action for purposes of his disability discrimination claim.  (Id.)

Regarding the third prong of the prima facie case requirement, Plaintiff maintains that there is a causal connection between his hemorrhoids condition, his negative review, and the subsequent termination of his employment.  Plaintiff argues that within a month of his request for continuous leave for surgery for his hemorrhoids condition, Defendant decided "to move to termination," showing the causal connection between his disability and the adverse employment actions of his 2021 negative performance review and his termination.  (Id. at 25.)  Plaintiff also maintains that the undisputed evidence of record establishes that Defendant's asserted legitimate, nondiscriminatory reason for his termination—his poor performance and violation of Defendant's policies—was a pretext for discrimination.  (Id. at 28–29.)

### 3.    Whether Defendant is Entitled to Summary Judgment as to Plaintiff's Disability Discrimination Claims

As noted supra, when addressing the first prong of a prima facie case of disability discrimination, the Court must first identify the life activities Plaintiff claims are affected by his impairment and determine whether they are major life activities under the ADA before evaluating whether Plaintiff's impairment substantially limits any major life activities.  See Parrotta, 363 F. Supp. 3d at 590–91.  Plaintiff asserts that his hemorrhoids condition, when active, prevented him from sitting and standing for prolonged periods of time, riding a motorcycle, passing bowel movements, and maintaining a healthy diet.  (Doc. No. 61 at 21–22.)

As an initial matter, the Court notes that Plaintiff provides no support for his position that "riding a motorcycle" is a major life activity under the ADA.  Given Plaintiff's lack of authority for such a position and the fact that courts have held that "driving" is not a major life activity, the Court will not consider "riding a motorcycle" as a major life activity in connection with Plaintiff's disability discrimination claim.  See, e.g., Tedeschi v. Sysco Foods of Philadelphia, Inc., No. 99-cv-03170, 2000 WL 1281266, at *5 (E.D. Pa. 2000) (citing Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998) (holding that "driving" is not a major life activity under the ADA)).

Further, although "eating" is certainly a major life activity, see 42 U.S.C. § 12102(2)(A), Plaintiff fails to provide support for the proposition that "maintaining a healthy diet" is a major life activity.  Accordingly, the Court will not consider "maintaining a healthy diet" as a major life activity in connection with Plaintiff's disability discrimination claim.

It is clear that the ability to stand (and presumptively, also to sit) qualifies as a major life activity.  See 42 U.S.C. § 12102(2)(A) (identifying standing as a major life activity).  Further, given the inclusion of "digestive" and "bowel" under the statutory listing of major bodily functions that constitute a major life activity, see id. § 12102(2)(B), the Court will assume without deciding that passing bowel movements is a major life activity.  Accordingly, the Court next considers whether Plaintiff has adduced evidence from which a reasonable factfinder could conclude that his hemorrhoids condition substantially limited his ability to perform these major life activities.

Upon careful consideration of the evidence of record, viewed in the light most favorable to Plaintiff, the nonmoving party, the Court concludes that Plaintiff has failed to produce evidence from which a reasonable factfinder could conclude that his hemorrhoids condition

35

substantially limited his ability to sit or stand or pass bowel movements at any point in time prior to his termination.  As noted supra, Defendant argues that because Plaintiff was cleared to return to work in August 2021 with no limitations (two months prior to his termination in October 2021, which Defendant views as his only adverse employment action), he was not disabled. Plaintiff responds to this argument by stating that his June 2021 negative performance review should count as an adverse employment action and in any event, his hemorrhoids condition is "recurring and episodic" (Doc. No. 61 at 21), pointing to the ADA regulation indicating that an impairment that has gone into remission remains protected "if the disability would substantially impair major life activities when active" (id. (citing 29 C.F.R. § 1630.2(i); (j)(1)(vii))).

Although the Court recognizes that the definition of disability is to be construed "in favor of broad coverage of individuals" and "to the maximum extent permitted," see 42 U.S.C. § 12102(4)(A), a "qualifying impairment must still create an 'important' limitation," see Kocher v. Municipality of Kingston, 400 F. Supp. 3d 138, 157 (M.D. Pa. 2019) (citation omitted), and the Court concludes that Plaintiff has failed to proffer evidence of such a limitation here.  Rather, the evidence of record regarding any limitation as to Plaintiff's ability to sit or stand or pass bowel movements is minimal and comes largely from Plaintiff's deposition testimony and the deposition testimony of Plaintiff's supervisors, who testified that Plaintiff told them that he had difficulty sitting and standing for prolonged periods of time, as well as text messages between Plaintiff and his supervisors.  See, e.g., (Doc. No. 54 at 409–10, 439–40 (Hill Dep. at 35:19-36:7, 65:5-13, 66:13-20); Doc. No. 61-4 at 96 (Curtis Dep. at 15:2-18)).  The record simply does not reflect the length of the periods of time Plaintiff had difficulty sitting or standing or the frequency of those periods of time.  It is undisputed that in March 2020, Defendant approved Plaintiff's request to take intermittent FMLA leave up to twice a week allegedly due to

36

symptoms of his hemorrhoids condition.  (Doc. No. 49 ¶ 13.)  However, the record lacks evidence of the severity and duration of any limitation on Plaintiff's ability to sit or stand on those dates when he took intermittent FMLA leave.   Plaintiff has simply failed to produce sufficient evidence from which a reasonable factfinder could conclude that his ability to sit or stand was significantly limited by his hemorrhoids condition at any point in time prior to his termination.

Further, as to passing bowel movements, Plaintiff has produced evidence consisting of a photograph of bloody stool in a toilet as evidence of his limitation in passing bowel movements, see (Doc. No. 61 at 23 (referencing Doc. No. 61-4 at 564)), and although that photo provides evidence that Plaintiff may have experienced bleeding while passing bowel movements, it does not amount to sufficient evidence from which a reasonable factfinder could conclude that Plaintiff was significantly limited in his ability to pass bowel movements, either on that occasion or any other.  Again, Plaintiff has simply failed to provide evidence that would permit a factfinder to assess the severity or duration of any limitation on passing bowel movements.  In the absence of such evidence, the factfinder lacks evidence from which to determine the extent to which that impairment limited—or substantially limited—Plaintiff's ability to pass bowel movements.

In sum, although a reasonable factfinder could conclude that Plaintiff's hemorrhoids condition amounted to an impairment, Plaintiff has simply failed to produce evidence from which a reasonable factfinder could conclude that his hemorrhoids condition substantially limited his ability to sit or stand or pass bowel movements at any point in time prior to his termination in October 2021.  Accordingly, the Court concludes that Plaintiff has failed to proffer sufficient evidence from which a reasonable factfinder could conclude that he was

disabled within the meaning of the ADA.  See Rader v. Upper Cumberland Human Resource Agency, 171 F. Supp. 3d 751, 758–59 (M.D. Tenn. 2016) (granting summary judgment for defendant on plaintiff's disability discrimination claim and holding that, although plaintiff's diagnosis of colitis and diverticula (and hemorrhoids) constituted a physical impairment under the ADA, plaintiff failed to produce evidence that his impairments substantially limited a major life activity).

As noted supra, Plaintiff also maintains that he meets the "record of" disability definition under the ADA.  This prong is designed to ensure that employees cannot be subject to discrimination because of a recorded history of a disability.  See Eshelman, 554 F.3d at 436–37 (noting that this definition applies to individuals who once suffered from an impairment that substantially limited a major life activity, recovered from the impairment, but nonetheless faced employment discrimination due to it).   "Of course, if the record at issue does not reference a disability or condition covered by the ADA, [the defendant] is not liable even if it did rely on that record in making the adverse employment decision."  See id. at 437.  This inquiry "focuses on whether the plaintiff has submitted evidence that the actual extent of his or her impairment was substantial."  See id.  Here, given the Court's conclusion that Plaintiff has failed to proffer sufficient evidence from which a reasonable factfinder could conclude that he was disabled—or substantially limited in his ability to perform a major life activity—at any time prior to his termination, it follows that he also fails to proffer evidence that Defendant relied on a record demonstrating a substantial impairment.  Accordingly, Plaintiff fails to establish that he is disabled within the meaning of the ADA under the "record of" definition.

Having failed to produce evidence from which a reasonable factfinder could conclude that he is disabled, Plaintiff has not established a prima facie case of disability discrimination

under the ADA and PHRA.  Accordingly, the Court will grant Defendant's motion for summary

judgment as to Plaintiff's claims of disability discrimination.  The Court turns to Plaintiff's

claims of retaliation.

C.      Retaliation—Title VII, § 1981, ADA, and the PHRA

1.      Legal Standard[49]

To establish a prima facie case of retaliation under Title VII, Section 1981, the ADA, and

the PHRA, a plaintiff must show: "(1) that he engaged in protected conduct; (2) that he was

subject to an adverse employment action subsequent to such activity; and (3) that a causal link

exists between the protected activity and the adverse action."  See Qin, 100 F.4th at 475 (citing

Barber v. CSX Distrib. Servs., 68 F.3d 694, 701 (3d Cir. 1995)).  As to the first element of a

prima facie case, "participat[ion] in certain Title VII proceedings" and "oppos[ition] [to]

discrimination made unlawful by Title VII []" constitute protected activities.  See Moore v. City

of Phila., 461 F.3d 331, 341 (3d Cir. 2006) (internal quotation marks omitted) (defining

protected activity in the Title VII retaliation context); accord Castleberry v. STI Grp., 863 F.3d

259, 267 (3d Cir. 2017) (utilizing the Title VII definition for protected activity in the Section

1981 context).  "[P]rotected 'opposition' activity includes not only an employee's filing of

formal charges of discrimination against an employer but also 'informal protests of

discriminatory employment practices, including making complaints to management.'"  Daniels

---

[49]  Because the legal standard for analyzing retaliation claims is identical under Title VII, Section
1981, the ADA, and the PHRA, the Court presents the law applicable to these claims jointly.
See Jones, 198 F.3d at 415 (utilizing the McDonnell-Douglas burden-shifting framework for
Title VII, Section 1981, and PHRA retaliation claims); see also Est. of Oliva ex rel. McHugh v.
New Jersey, 604 F.3d 788, 798 n.14 (3d Cir. 2010) (maintaining that the Title VII retaliation
standard applies in Section 1981 cases); E.E.O.C. v. Allstate Ins. Co., 778 F.3d 444, 448–49 (3d
Cir. 2015) ("[t]he antiretaliation provisions 'are nearly identical,' and 'precedent interpreting any
one of [Title VII and the ADA] is equally relevant to interpretation of the other[]'" (quoting
Fogelman, 283 F.3d at 567)).

v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015) (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc., 450 F.3d 130, 135 (3d Cir. 2006)).  To show opposition to an illegal employment practice, a plaintiff "must identify the employer and the practice—if not specifically, at least by context."  See Curay-Cramer, 450 F.3d at 135.  A plaintiff must also show under the first element of a prima facie case of retaliation that he or she held "'an objectively reasonable belief, in good faith, that the activity [opposed] is unlawful under Title VII.'"  See Kengerski v. Harper, 6 F.4th 531, 536 (3d Cir. 2021) (quoting Moore, 461 F.3d at 341).

As for the second element of a prima facie case of retaliation, a plaintiff must show that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  See Moore, 461 F.3d at 341 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (hereinafter "Burlington")); Est. of Oliva, 604 F.3d at 798 (applying the "materially adverse" definition for the second element of a Title VII prima facie case of retaliation to a Section 1981 retaliation claim).

The third element of a prima facie case of retaliation requires "a plaintiff [to] show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  See Moore, 461 F.3d at 341–42.  In other words, a plaintiff must "identif[y] what harassment, if any, a reasonable jury could link to a retaliatory animus."  See id. at 342.  A plaintiff can establish a causal connection between his or her protected employment activity and an employer's adverse employment action by pointing to "a broad array of evidence."  See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217,

40

232 (3d Cir. 2007) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000)).

"Where the temporal proximity between the protected activity and the adverse action is

'unusually suggestive,' it is sufficient standing alone to create an inference of causality and

defeat summary judgment." Id. Courts in this circuit measure temporal proximity from the first

date the employee engaged in his or her protected activity. See Capps v. Mondelez Glob. LLC,

147 F. Supp. 3d 327, 337 (E.D. Pa. 2015), aff'd, 847 F.3d 144 (3d Cir. 2017) (citing Blakney v.

City of Philadelphia, 559 F. App'x 183, 186 (3d Cir. 2014) (unpublished) (citing Jalil v. Avdel

Corp., 873 F.2d 701, 703 (3d Cir. 1989))); Pizarro v. Int'l Paper Co., No. 19-cv-05081, 2020 WL

1032341, *4 (D.N.J. Mar. 3, 2020) (citing Blakney, 559 F. App'x at 186). "Where the temporal

proximity is not 'unusually suggestive,' [a court] ask[s] whether 'the proffered evidence, looked

at as a whole, may suffice to raise the inference.'" LeBoon, 503 F.3d at 232 (quoting Farrell,

206 F.3d at 280). A plaintiff may also establish a causal connection between her protected

employment activity and an employer's adverse employment action by pointing to evidence such

as "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated

reasons for terminating the employee, or any other evidence in the record sufficient to support

the inference of retaliatory animus." See id. at 232–33.

Where circumstantial evidence is used to prove retaliation, courts use the McDonnell

Douglas burden-shifting framework. See Qin, 100 F.4th at 475. If an employee establishes a

prima facie case of retaliation, the burden shifts to the employer to "advance a legitimate, non-

retaliatory reason for its adverse employment action." See Krouse, 126 F.3d at 500 (citing

Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997)). If the employer satisfies its

burden, then the burden shifts back to the employee to "to convince the fact[]finder both that the

employer's proffered explanation was false, and that retaliation was the real reason for the

41

adverse employment action."  See Smith v. City of Atl. City, 138 F.4th 759, 777 (3d Cir. 2025) (quoting Moore, 461 F.3d at 342).

### 2.    Arguments of the Parties

#### a.    Title VII, § 1981, and the PHRA

Defendant argues that Plaintiff cannot point to evidence demonstrating a prima facie case of retaliation based on race or sex.  (Doc. No. 50 at 32.)  Like its arguments concerning race and sex discrimination, Defendant argues that the Court should consider only Plaintiff's termination as the adverse action and that Plaintiff cannot point to evidence demonstrating a causal link between the termination of his employment and his protected activity of complaining about race or sex discrimination to Defendant's hotline.  (Id. at 33.)  Defendant maintains that Plaintiff cannot establish a causal connection because he has failed to present evidence that the decisionmakers regarding his termination, Hill and Slike, knew that he had submitted a complaint of discrimination.  (Id. at 33–34.)  In addition, Defendant argues that the facts of record do not "support[] an inference of retaliation based on temporal proximity" because it is undisputed that Plaintiff's hotline complaint came five (5) days after the imposition of his PIP and a month before his termination.  (Id. at 35 (citing Doc. No. 49 ¶¶ 80, 84).)  Further, Defendant argues that Plaintiff can demonstrate neither a pattern of antagonism nor evidence supporting a record of retaliatory animus, because the record demonstrates that Plaintiff's termination "was the result of a series of disciplinary and behavioral issues, which Plaintiff was given many opportunities to correct."  (Id.)  Therefore, Defendant maintains that Plaintiff cannot establish a prima facie case of retaliation based on a complaint of race or sex discrimination and, for those same reasons, fails to cast doubt on its legitimate reason for his termination.  (Id. at 35–36.)

In response, Plaintiff contends that he engaged in the Title VII, Section 1981, and PHRA protected activity of complaining to Defendant's hotline of race and sex discrimination. (Doc. No. 61 at 31–32.) Plaintiff then argues that his placement on a PIP should be considered an adverse employment action for purposes of his retaliation claims and could deter a reasonable worker from raising additional complaints because: the PIP required him "to achieve 100% completion of each of its components[;]" Hill failed to meet with him on a weekly basis; and Hill "failed to identify specific information that would have helped him improve in th[ose] areas [that] he needed to." (Id. at 33–34.) As to the causation element, Plaintiff asserts that "[w]ith respect to [his] internal complaints of discrimination, [Defendant's] failure to properly investigate any of his complaints is compelling evidence of antagonism sufficient to establish a causal connection between his complaints and termination through a sham PIP." (Id. at 35.)

**b.    ADA and PHRA**

Defendant argues that Plaintiff cannot point to evidence to demonstrate a prima facie case of ADA/PHRA retaliation. (Doc. No. 50 at 36.) Defendant acknowledges that a request for accommodation under the ADA is a protected activity, but asserts that Plaintiff did not engage in a protected activity because: he did not invoke the ADA when he took FMLA leave for his hemorrhoid surgery; he did not formally request accommodations under the ADA after his return from FMLA leave; and further, his September 14, 2021 complaint to Defendant's hotline made no mention of ADA discrimination. (Id. at 37.) Defendant also argues that, even assuming Plaintiff engaged in a protected ADA activity, the two months between Plaintiff's medical leave and termination are not "unusually suggestive" of retaliation. and neither is the five-week period between his hotline complaint of discrimination and the termination of his employment. (Id. at 38.) Defendant maintains that Plaintiff fails to identify evidence that demonstrates a "'pattern of

43

antagonism' following any protected conduct," because the undisputed evidence of record "shows no clear connection to his leave or complaint." (Id. (quoting Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001)).) Lastly, Defendant asserts that, even if Plaintiff could establish a prima facie case of ADA retaliation, he nonetheless fails to point to evidence demonstrating that Defendant's legitimate, nonretaliatory reason for the termination of his employment was pretextual and that retaliation based on any protected activity was the real reason for his termination. (Id. at 39.)

In response, Plaintiff argues he engaged in ADA-protected activity because "an accommodation request does not need to be in writing or formally invoke the magic words 'reasonable accommodation' or 'ADA'" and so Plaintiff's "various requests for—and use of—periodic leaves to treat his hemorrhoids was protected as a valid accommodation request under the ADA." (Doc. No. 61 at 32 (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)).) He also maintains that the record reflects that he complained to Curtis of disability-based discrimination. (Id. at 31–32.) He asserts that the issuance of the PIP qualifies as an adverse action for purposes of his retaliation claim and that "outward hostility surrounding the administration of the PIP could certainly serve to deter a reasonable employee from raising additional complaints." (Id. at 33–34.) As to the causation element, Plaintiff asserts that "[w]ith respect to [his] internal complaints of discrimination, [Defendant's] failure to properly investigate any of his complaints is compelling evidence of antagonism sufficient to establish a causal connection between his complaints and termination through a sham PIP." (Id. at 35.)

> 3.    **Whether Defendant is Entitled to Summary Judgment on Plaintiff's Claims of Retaliation Under Title VII, Section 1981, the ADA, and the PHRA**

As an initial matter, the Court need not resolve the parties' dispute regarding whether

Plaintiff has adequately demonstrated a prima facie case of Title VII, Section 1981, ADA, and PHRA retaliation because even assuming that he has, and upon consideration of the evidence of record and arguments of the parties, and construing all facts in the light most favorable to Plaintiff, the non-moving party, the Court concludes that Plaintiff has failed to produce sufficient evidence to support a reasonable factfinder's conclusion that Defendant's legitimate, nonretaliatory reason for terminating his employment—namely, Plaintiff's history of poor performance and his failure to fulfill the requirements of the PIP—was false and that retaliation for his complaints of discrimination was the real reason for his termination. See Smith, 138 F.4th at 777. In attempting to meet that burden, Plaintiff identifies several pieces of evidence that he maintains demonstrate that Defendant's legitimate, nonretaliatory reason was false and that retaliation was the real reason for his termination. The Court addresses each in turn.

Plaintiff first argues that Defendant attempts to shift the focus away from the contents of the PIP by pointing to the DDs issued to him, arguing that they do not provide support for his termination because some of his DDs were not signed, were issued by non-decisionmakers, and are old. (Doc. No. 61 at 28–31.) At the outset, because Plaintiff's RSUMF disputes the DDs as containing hearsay, the Court must determine whether they are capable of admission at trial and therefore properly considered in connection with Defendant's motion for summary judgment. See Shelton v. Univ. of Med. & Dentistry of New Jersey, 223 F.3d 220, 223 n.2 (3d Cir. 2009) (stating that "[i]n this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial"). Hearsay is "a statement that [] the declarant does not make while testifying at the current trial or hearing and [that] a party offers in evidence to prove the truth of the matter asserted in the statement." See Fed. R. Evid. 801(c) (cleaned up). The business records exception:

permits admission of documents containing hearsay provided foundation testimony is made by "the custodian or other qualified witness," that: (1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business.

See United States v. Pelullo, 964 F.2d 193, 200 (3d Cir. 1992); Fed. R. Evid. 803(6).

The Court concludes that the DDs are hearsay but that the business records exception to hearsay may apply to permit their admission at trial. The undisputed evidence of record referenced supra shows preparation of the DDs, including a narrative of the infraction, by the observer; production and maintenance of the DDs according to Defendant's policies; and production at or near the time of observance. (Doc. No. 54 at 19–25.) As such, the DDs are hearsay because they contain out of court statements asserted for the truth of Plaintiff's poor performance and violations of company policy. See Fed. R. Evid. 801(c). However, the undisputed evidence of record also demonstrates that the business records exception may apply because the DDs were prepared by a supervisor with personal knowledge, produced contemporaneously, made in the regular course of Defendant's business, and are regularly kept in the course of Defendant's business. See Pelullo, 964 F.2d at 200 (holding that business record exception permits admission of documents made by a declarant with personal knowledge, contemporaneously with the actions that the heart of the report, made in the regular course of business, and regularly kept by the business); Fed. R. Evid. 803(6). Because the DDs are capable of admission at trial despite their hearsay nature provided that Defendant lays the proper foundation, the Court may consider them in connection with a motion for summary judgment. See Shelton, 223 F.3d at 223 n.2 ("hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial").

Returning to Plaintiff's argument that Defendant attempts to shift focus away from the

PIP by pointing to his history of poor performance and numerous DDs to demonstrate a pretext for retaliation, the Court finds that Plaintiff has failed to discharge his burden to present evidence permitting a reasonable factfinder to believe that the employer's proffered explanation was false and that retaliation was the real reason for the adverse employment action.  Plaintiff argues that the PIP does not discuss his poor performance history, but the second page of the PIP notes that Plaintiff had four prior DDs from May 4, 2021 through June 9, 2021.  (Doc. No. 54 at 731.) Further, the PIP explains that: Plaintiff's performance was "unsatisfactory[;]" he did not consistently complete assignments; he neglected his supervisory duties; he did not follow through with direct instructions; and he was not "dialed in and engaged with the start of shift calls[.]"  (Id.)  The June 2021 email thread between Plaintiff's supervisors and Defendant's HR employees also demonstrates that Plaintiff's PIP was based on his history of poor work performance.  That email thread shows that Defendant's management employees considered placing Plaintiff on a PIP due to his numerous DDs from the past and several DDs to be issued, at the time, for failing to complete his AO audit, ADA compliance training, and an FLC learning assignment.  (Doc. No. 54 at 705–07.)

Plaintiff's assertion that some DDs were unsigned, were issued by non-decisionmakers, and are old similarly fails to show a weakness in Defendant's legitimate, nonretaliatory reason because the unsigned DDs are fewer than the signed DDs and the DDs issued by non-decisionmakers as well as the old DDs support Defendant's position that Plaintiff had a history of poor performance.[50]  As to the unsigned DDs, the undisputed facts demonstrate that Plaintiff

---

[50]  The Court notes that Plaintiff asserts, without further argument, that some of the DDs are unsigned, issued by non-decisionmakers, and are old.  The Court interprets Plaintiff's assertion to mean that those DDs are invalid because: they lack a signature acknowledging their issuance or receipt; they were not issued by his supervisors responsible for his termination; and they were issued up to five years earlier than his termination.  See (Doc. No. 61-3 ¶¶ 22, 28, 30, 32)

received at least eighteen (18) DDs during the course of his employment with Defendant. Of those eighteen (18), fourteen (14) of the DDs were signed by at least Plaintiff or one of his supervisors and eleven (11) were signed by both Plaintiff and one of his supervisors. See (Doc. No. 54 at 513–18, 656–70, 676–96, 700–03, 708–21, 725–28 (showing eleven (11) out of eighteen (18) DDs were signed by both Plaintiff and a supervisor, three (3) signed by only a supervisor, and four (4) unsigned by anyone)). Thus, even excluding the unsigned DDs, a majority of the DDs still reflect Defendant's history of poor performance. Accordingly, the Court concludes that the fact that a minority of DDs lack a signature is not suggestive of pretext.

As to Plaintiff's argument that the DDs were issued by non-decisionmakers and are old, the Court similarly determines that these facts do not demonstrate a weakness in Defendant's legitimate, nonretaliatory reason for terminating Plaintiff's employment because they illustrate Plaintiff's long history of poor performance. The undisputed facts show that the DDs from non-decisionmakers were issued by Hamrick, who was Plaintiff's supervisor before Hill. The fact that Hamrick was not a decisionmaker at the time of Plaintiff's termination does not invalidate the DDs issued by her against Plaintiff. Indeed, that fact strengthens Defendant's position because it shows Plaintiff's poor performance occurred under multiple supervisors, including a supervisor who was not involved in the termination of his employment and was not alleged to have discriminated against him. The fact that some DDs are old also demonstrates Plaintiff's history of poor performance because they record Plaintiff failing to perform his duties as expected as far back as 2016, 2017, and 2018. Accordingly, the Court determines that the fact that some DDs lack signatures, were issued by non-decisionmakers, and are old, is insufficient to lead a factfinder to reasonably disbelieve Defendant's legitimate, nonretaliatory reason for

---

(disputing the DDs as immaterial due to predating Plaintiff's termination by three to five years).

48

Plaintiff's termination.

The Court next addresses Plaintiff's argument that the PIP and its surrounding circumstances demonstrate that Defendant's legitimate, nonretaliatory reasons were false and that retaliation was the real reason for Plaintiff's termination.  (Doc. No. 61 at 29–30.)  First, the PIP's length of four (4) weeks was not violative of any of Defendant's policies because it mirrored Defendant's policy with the suggestion of one month.  Second, Plaintiff failed many aspects of the PIP such as failing to complete his PCOs on time; failing to draft several DDs regarding attendance violations of his teammates; failing to communicate with the representatives of staffing agencies to address low performing temporary employees; not responding to requests for acknowledgment; not responding to the manager's request for a face-to-face PIP meeting; failing and/or refusing to show up for the start of shift meetings; and failing and/or refusing to complete administrative tasks on time.  (Doc. No. 49 ¶¶ 94–97.)  Third, Plaintiff fails to proffer any evidence demonstrating that not extending Plaintiff's PIP was a violation of any policy, custom, or law.  Fourth, the undisputed evidence of record does not show that Hill worked against Plaintiff while on the PIP because it shows that Hill met with him during his PIP and demonstrates that it was not her responsibility, but Plaintiff's, to know which teammates needed to be cited for attendance violations.  Even if Hill wanted to provide guidance, the undisputed facts also indicate that it was Plaintiff who viewed those teammates daily and thus was in a better position to determine who needed to be cited for attendance violations. (Doc. No. 61-4 at 24.)  Fifth, and lastly, the June 2021 email thread does not show that Plaintiff's termination was a foregone conclusion but rather that Defendant's HR employees thought that he should be placed on a PIP for his unauthorized absences and failing to complete his AO audits, PCOs, ADA compliance, and FLC learning assignment.  (Doc. No. 49 ¶¶ 71–75.)  Thus,

Plaintiff's reference to the PIP and its circumstances is insufficient for a factfinder to reasonably conclude that Defendant's legitimate, nonretaliatory reason for terminating his employment is false and that retaliation was the real reason for Plaintiff's termination.

Plaintiff also points to Young's allegedly inadequate investigation of his complaint of discrimination and the temporal proximity between his complaint of discrimination and termination as demonstrative of a causal link and of pretext.  (Doc. No. 61 at 35–37.)  Plaintiff points to the following evidence as demonstrative of retaliatory animus in aggregate: (1) Young's failure to interview the respondents during his investigation of Plaintiff's discrimination claims; (2) the fact that Young advised as to whether Plaintiff's should be placed on a PIP and also investigated Plaintiff's complaints of discrimination, which Plaintiff asserts is a conflict of interest; and (3) the fact that Young allowed the PIP to run concurrently with his investigation despite the fact that Plaintiff included the PIP as an example of discrimination.

As to Young's alleged failure to interview the respondents, as stated supra, the undisputed evidence of record shows that Young interviewed Wagner, who was one of the three (3) respondents.  See supra at 26.  Moreover, Defendant's policies state that an investigation into discrimination may, not must, include interviewing those accused of discrimination.  See (Doc. No. 54 at 7); Palmer, 235 F. Supp. 3d at 723 (concluding that nothing in the record, including the plaintiff's evidence of an alleged inadequate investigation in which the investigator failed to interview a witness, indicated a pretext for retaliation because the plaintiff could not point to evidence of retaliatory animus).

The Court finds Plaintiff's argument that Young advising on Plaintiff's placement on a PIP and investigating his discrimination complaints constitutes a conflict of interest unavailing. The record is silent as to what constitutes a conflict of interest pursuant to Defendant's policies,

and Plaintiff provides no authority demonstrating a conflict of interest in this situation.  The Court is left to glean what is considered a conflict in this context from the testimony of Young. When asked the question "would it be a conflict of interest for the individuals who decided to issue the [PIP] to investigate whether or not the PIP was discriminatory[,]" Young replied that "it would depend on who issued [the PIP] [. . .] and who conducted the investigation."  (Doc. No. 61-4 at 136.)  The Court interprets Young's explanation to mean that a conflict of interest would arise if the person who issued the PIP also conducted the investigation into discrimination. However, the evidence of record reflects that those circumstances did not occur here, as the record reflects that Hill issued the PIP and Young conducted the investigation into Plaintiff's complaints of discrimination.  (Doc. Nos. 54 at 730–32; 71-5 at 2.)  Accordingly, this argument fails to demonstrate a weakness in Defendant's legitimate nonretaliatory reasons for terminating Plaintiff.

The Court concludes that Young allowing Plaintiff's PIP to run concurrently with his investigation into Plaintiff's complaints of discrimination is not demonstrative of a pretext for retaliation.  Plaintiff points to no evidence suggesting that allowing his PIP and his investigation to run concurrently is violative of any policy or custom.  Plaintiff also fails to point to any authority suggesting that practice is improper.  Further, Defendant's policies indicate that investigations into complaints of discrimination are meant to be confidential "to the extent reasonably possible under the circumstances in the Company's judgment."  (Doc. No. 54 at 8.) Because Hill and Slike were Plaintiff's supervisors and respondents to the allegations of discrimination, it stands to reason that Young would allow the PIP to continue so as to prevent Hill and Slike from learning of the investigation until the necessary time.  Accordingly, the Court concludes that allowing Plaintiff's PIP to run concurrently with the investigation into his

51

complaints of discrimination is not demonstrative of a pretext for retaliation.

In addition, the temporal proximity of Plaintiff's termination and his complaints of discrimination are not sufficient at the pretext stage to demonstrate falsity or that retaliation is the but-for cause of Plaintiff's termination. Plaintiff contends that he complained to Curtis of sex discrimination on September 7, 2021, and of race and sex discrimination to the Alertline on September 14, 2021. (Doc. Nos. 61-4 at 107, 150; 71-5 at 2.) Defendant terminated Plaintiff's employment on October 19, 2021. (Doc. Nos. 49 ¶ 98; 61-3 ¶ 98.) Thus, at least four (4) weeks passed between Plaintiff's protected activities and his termination. Although this timeframe may be sufficient to establish the causation prong of the prima facie case, see Qin, 100 F.4th at 476–77 ("[termination six weeks after complaining about discrimination] is well within the three-month range to be unusually suggestive of retaliatory motive"), it is insufficient to establish that Defendant's legitimate, nonretaliatory reason is false or that retaliation is the real reason for Plaintiff's termination because, even considered with Plaintiff's other evidence, the evidence demonstrates that Plaintiff was terminated based on his history of poor performance and his failure to fulfill the requirements of the PIP. See Ross v. Gilhuly, 755 F.3d 185, 194 (3d Cir. 2014) (reiterating that "[a]n employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity"); Steele v. Pelmor Lab'ys, Inc., 725 F. App'x 176, 181 (3d Cir. 2018) (unpublished) (concluding that temporal proximity, even considered with other evidence, failed to demonstrate a pretext for retaliation when "ample evidence to the contrary" supported the defendant's legitimate, nonretaliatory reason for terminating the plaintiff).[51]

---

[51] The Third Circuit has acknowledged that its unpublished opinions may nonetheless contain

Thus, viewing the record as a whole and construing all facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to adduce evidence from which a factfinder could reasonably conclude that Defendant's legitimate, nonretaliatory reasons for his termination were false, and that retaliatory animus for complaints of race, sex or disability discrimination was the real reason for Plaintiff's termination.  Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's Title VII, Section 1981, ADA, and PHRA retaliation claims.

### D.      Retaliation—FMLA

#### 1.      Legal Standard

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012).  Where a plaintiff seeks to establish FMLA retaliation based on circumstantial evidence, courts utilize the McDonnell Douglas burden-shifting framework.  See id.  A plaintiff establishes a prima facie case of FMLA retaliation by demonstrating the following: "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."  See id. (citing Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508–09 (3d Cir. 2009)).  An employee invokes his or her rights under the FMLA by "provid[ing] adequate notice as to their need for leave."  See id. at 301.  "When the need for leave is unforeseeable, employees are obligated to notify their employer 'as soon as

---

persuasive reasoning.  See New Jersey, Dep't of Treasury, Div. of Inv. v. Fuld, 604 F.3d 816, 823 (3d Cir. 2010) (noting that an unpublished opinion is "as persuasive as its reasoning"); see also Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 n.12 (3d Cir. 1996) (following an unpublished opinion based on "factual similarity" and "look[ing] to the [unpublished opinion] as a paradigm of the legal analysis").

practicable,'[] and 'provide sufficient information for an employer to reasonably determine whether the FMLA may apply'[]." Id. (quoting 29 C.F.R. §§ 825.303(a), (b)).

As for an adverse employment action, although the Third Circuit has not yet held that the Burlington standard for determining an adverse employment action applies to FMLA retaliation claims, courts within the Third Circuit have used the Burlington standard of whether "a reasonable employee would have found the challenged actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" See, e.g., Wevodau v. Pennsylvania Off. of the Att'y Gen., 227 F. Supp. 3d 404, 408 (M.D. Pa. 2017) (citing Moore, 461 F.3d at 341 and using the Burlington adverse employment action definition in an FMLA retaliation case); Kumar v. Johnson & Johnson, Inc., No. 12-cv-00079, 2014 WL 5512549, *13 n.9 (D.N.J. Oct. 31, 2014) (applying the Burlington standard to an FMLA retaliation claim while noting that the Third Circuit has "never squarely held that the 'materially adverse' standard applies in the context of an FMLA retaliation claim"); Grosso v. Fed. Exp. Corp., 467 F. Supp. 2d 449, 459 (E.D. Pa. 2006) (reasoning that the standard from Burlington applies to FMLA retaliation claims).

To demonstrate causation for a prima facie case of FMLA retaliation, a plaintiff "must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination." See Lichtenstein, 691 F.3d at 307. "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" Id. (quoting LeBoon, 503 F.3d at 232). Courts in this circuit measure temporal proximity from the first date the employee engaged in his or her protected activity. See Capps, 147 F. Supp. 3d at 337 (citing Blakney, 559 F. App'x at 186 (citing Jalil, 873 F.2d at 703)); Pizarro, 2020 WL 1032341 at *4

54

(citing Blakney, 559 F. App'x at 186).  In those cases where the temporal proximity is not unusually suggestive, a reviewing court must ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference."  See Lichtenstein, 691 F.3d at 307 (quoting LeBoon, 503 F.3d at 232).

Once an employee establishes a prima facie case of FMLA retaliation, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for its decision."  See id. at 302 (internal quotation marks and citation omitted).  If the employer satisfies its burden, then the employee "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [the employer's] articulated legitimate reasons."  See id. (citing Fuentes, 32 F.3d at 764).  "To do so, [a plaintiff] 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them "unworthy of credence."'"  Id. at 310 (quoting Fuentes, 32 F.3d at 765).

### 2.    Arguments of the Parties

Defendant maintains that Plaintiff's FMLA retaliation claim fails as a matter of law. (Doc. No. 61 at 27.)  Defendant argues that Plaintiff cannot demonstrate a prima facie case of retaliation under the FMLA because: (1) he cannot establish a causal connection based on temporal proximity between his FMLA leave and the termination of his employment; and (2) he cannot show a demonstrated "pattern of antagonism in the intervening period between his FMLA leave and his termination." (Id. at 28–29 (internal quotation omitted).)  Defendant argues that Plaintiff's placement on a PIP, without more, is insufficient to demonstrate a causal connection between his FMLA leave and the termination of his employment. (Id. at 29.)  Defendant asserts that, even assuming Plaintiff could demonstrate a prima facie case, it is still entitled to summary

judgment on his FMLA retaliation claim because Plaintiff cannot point to any evidence from which a factfinder could reasonably disbelieve its legitimate, nonretaliatory reason for terminating his employment. (Id. at 31.)

In response, Plaintiff reiterates his arguments supra contending that he engaged in the FMLA protected activities of requesting leaves of absence for reasons related to his hemorrhoids condition. (Doc. No. 61 at 31–32.) Plaintiff argues that, for purposes of his FMLA retaliation claim, the issuance of the PIP, as well as his ultimate termination, qualify as adverse actions. (Id. at 33–34.) As to the causation element, Plaintiff asserts that a reasonable factfinder could find a causal connection between his request for and taking of protected leaves of absence, his negative performance review, the issuance of his PIP, and the termination of his employment for the same reasons as expressed above. (Id. at 35.) Plaintiff lastly reiterates that the reasons indicative of a showing of pretext in the disparate treatment discrimination context serve as evidence from which a factfinder could reasonably disbelieve Defendant's legitimate, nonretaliatory reason for the termination of Plaintiff's employment. (Id. at 37.)

### 3.    Whether Defendant is Entitled to Summary Judgment on Plaintiff's FMLA Retaliation Claim

The Court need not resolve the parties' dispute regarding whether Plaintiff has adequately demonstrated the three elements of a prima facie case of FMLA retaliation because even assuming that he has, and upon review of the briefs of the parties and the evidence of record, and construing all facts in the light most favorable to Plaintiff, the non-moving party, the Court concludes that Plaintiff has failed to produce sufficient evidence demonstrating that Defendant's legitimate, nonretaliatory reason for terminating his employment—namely, Plaintiff's history of poor performance and his failure to fulfill the requirements of the PIP—was mere pretext for retaliation. See Lichtenstein, 691 F.3d at 309. Plaintiff points to the same evidence to

56

demonstrate pretext here in the FMLA retaliation context as he did in connection with his Title VII, Section 1981, ADA, and PHRA retaliation claims. (Doc. No. 61 at 27–31, 37.) Thus, the Court concludes again that, viewing the record as a whole and construing all facts in the light most favorable to Plaintiff, Plaintiff has failed to adduce evidence from which a factfinder could reasonably conclude that Defendant's legitimate, nonretaliatory reasons for the imposition of the PIP and Plaintiff's later termination were pretext for retaliation. The undisputed evidence of record demonstrates that Plaintiff had a long history of poor performance prior to the implementation of the PIP, and that Plaintiff failed to fulfill the requirements of his PIP. Further, the evidence Plaintiff adduced regarding the PIP, his DDs, Young's investigation, and the June 2021 email do not indicate consideration of Plaintiff's FMLA leave as a reason for the termination of Plaintiff's employment. Thus, a factfinder could not reasonably conclude that Plaintiff's placement on a PIP and ultimate termination was a pretext for retaliation for taking FMLA leave. See Steele, 725 F. App'x at 181 (concluding that summary judgment was properly granted where there was "ample evidence" supporting the defendant's legitimate, nonretaliatory reason such as evidence of the plaintiff's "well-documented" poor performance). Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's FMLA retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment in its entirety. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania